Filed 7/29/16; pub. order 8/23/16 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERIK AUSTIN FLORES et al.,<br><br>    Defendant and Appellant. | D069899<br><br><br><br>(Super. Ct. No. FVI1403349) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Debra Harris, Judge. Affirmed as modified.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Erik Austin Flores.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant Mariah Rita Sugg.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Erik Flores is the father of three young children (John Doe 1, John Doe 2, and Jane Doe) who were the victims of the charged offenses. The information alleged that, between April 1, 2011, and June 5, 2014, Flores committed torture (Pen. Code, § 206, count 3)[1] and child abuse (§ 273a, subd. (a), count 4) on Jane Doe. The information further alleged that, during that same period, Flores committed torture (§ 206, count 7) and child abuse (§ 273a, subd. (a), count 8) on John Doe 2. The information further alleged that, during the same period, Flores committed child abuse (§ 273a, subd. (a), count 10) on John Doe 1. Finally, the information specifically alleged that Flores personally inflicted great bodily injury (§ 12022.7, subd. (d)) on the victims in connection with counts 4, 8 and 10.

Defendant Mariah Sugg had an "off-and-on" girlfriend relationship with Flores, and was separately charged with the same set of offenses against the same victims, but with differing windows of commission. The information alleged that, between December 1, 2012, and June 5, 2014, Sugg committed torture (§ 206, count 1) and child abuse (§ 273a, subd. (a), count 2) on Jane Doe. The information further alleged that Sugg committed torture (§ 206, count 5) and child abuse (§ 273a, subd. (a), count 6) on John Doe 2. The information further alleged Sugg committed child abuse (§ 273a, subd. (a), count 9) on John Doe 1. Finally, the information specifically alleged that Sugg personally inflicted great bodily injury (§ 12022.7, subd. (d)) on the victims in connection with counts 2, 6 and 9.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

The jury convicted Flores and Sugg on all counts, and found true the allegations Sugg personally inflicted great bodily injury in connection with counts 2 and 6 and that Flores personally inflicted great bodily injury in connection with counts 4 and 8. The court sentenced each defendant to two life terms plus six years, and imposed but stayed the sentence on the remaining convictions and true findings.

On appeal, Flores argues the court prejudicially erred by instructing the jury it could return guilty verdicts on the torture counts as an aider and abettor of Sugg under the natural and probable consequences doctrine. He also asserts the evidence was insufficient to support the torture convictions because there was no evidence either he or Sugg had the specific intent to cause cruel or extreme pain or suffering for the purposes of revenge, persuasion or any sadistic purpose.[2] In Sugg's separate appeal, she claims section 273a, subdivision (a), is unconstitutional based on vagueness and, alternatively, that the court was sua sponte required to instruct that the jury could not find her guilty of violating section 273a under the "willfully . . . permits" prong of that statute unless the jury found she had a duty to control Flores's conduct.

_____

[2]    Flores also asserts, in a claim joined in by Sugg, there are clerical errors in the minute order and abstract of judgment that must be corrected, because the court's oral pronouncement of sentence imposed a life term on counts 3 and 7 (as to Flores) and counts 1 and 5 (as to Sugg) but the minute order and abstract of judgment show a term of seven years to life was imposed on each of those counts. Flores and Sugg argue, and the People concede, that because the court's oral pronouncement of sentence controls over the minute order and abstract of judgment (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2), it must be corrected to show life terms on each of the correct counts. We agree and, on remand, the trial court shall correct the minute orders and abstracts of judgment to reflect imposition of life terms on counts 3 and 7 as to Flores and counts 1 and 5 as to Sugg. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186-187.)

3

FACTS[3]

A. Background

Flores is the father of John Doe 1, John Doe 2, and Jane Doe. The children's biological mother left Flores and took the children with her to Oregon in September 2011, but a few months later she sent the children to live with Flores because she had no money and was unable to care for them. She expected that it would be a temporary placement and that she would take the children back after she found a good job.

Flores was living with Janice N. (his then-girlfriend) and Janice's mother (Claudia) when the children were sent to live with him. Because Flores and Janice were homeless but Janice had a job, Flores would drive Janice to work and then take the children to the park, and they would return to Claudia's home after Janice finished work. Claudia noticed the children always returned home hungry, and she asked Flores on several occasions whether the children ate during the day, but Flores responded angrily by telling her, "Don't tell me f--- what to do with my kids, what to feed my kids."

Janice's aunt and uncle, Jose and Erika, also saw that Flores's children were skinny, hungry, dirty and neglected. Jose offered them food every time he saw them, and they would eat over and over again, consuming as much as possible. When Jose offered

_____

[3]    Where, as here, a defendant contends the evidence is insufficient to support his conviction, we must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We state the facts in the light most favorable to the judgment.

the children food while Flores was present, the children would ask Flores for permission to eat, which Jose thought was unusual.  When he learned Flores, Janice and the children were living out of their car, Jose offered to let the children stay with him and his wife, and Flores accepted.  The children lived with Jose and his wife for a couple of months beginning around April 2012.  The children were pale and hungry when they came to live with Jose, and ate "a lot" during the months they lived with him.  One day, while changing Jane Doe's diaper, Claudia noticed her genital area looked very red and swollen, and they suspected there had been sexual abuse, but made no report of the suspected abuse until later.[4]

Jose wanted to keep the children but ultimately had to return them after Flores called police and claimed Jose had kidnapped them.  When police came to Jose's home, Jose did not mention the suspected sexual abuse but did say the children were not ready to go home because Flores had no home, but police told Jose that Flores was the father and could take the children.  Jose reported the suspected sexual abuse after Flores removed the children from Jose's home.

---

[4]     Jose and Erika enrolled the children in preschool and daycare, and the owner of the daycare (Ms. Moran) noticed Jane Doe did not talk (which Moran thought unusual for that age), kept to herself, and her hair was thin.  They had to feed Jane Doe, even though she was two years old, and Moran saw Jane Doe's ribs protruded.  Moran also noticed Jane Doe would flinch when her diaper was changed and that her "private area looked swollen."  Moran ultimately reported her concerns of possible sexual abuse because of the flinching and the swelling around Jane Doe's genital area.

B. Flores's Relationship With Sugg

By the summer of 2012, after Flores regained custody of his children from Jose, he and his children had moved to Hesperia, California. A social worker, apparently responding to Jose's report of possible abuse, visited the children at Flores's mother's home sometime in May 2012 to investigate the condition of the children. When the social worker visited them, they appeared healthy. After a few follow-up visits that summer, including one after Flores and the children moved in with Sugg, the social worker closed the case.

Flores was involved in an "off-and-on" romantic relationship with Sugg. By August of 2012, Flores and the children had moved in with Sugg, and they were living with Sugg when the authorities finally intervened in June 2014 to remove the children from their care.[5]

C. The 2014 Reports and Actions

Sonia Jorge worked as a clerk at a grocery store in Hesperia, California. Beginning sometime in the first quarter of 2014, Jorge noticed Sugg (accompanied by a small boy and small girl) frequenting the store on Mondays. Both children were "so skinny" they were "almost bones." On one occasion, the girl's forehead was bruised and the boy had a black eye. Another employee asked Sugg if she could give the children

_____

[5]     In a statement to police after the children were taken away, Flores said he moved in with Sugg to help with rent and expenses. He said he had moved back in with his mother for a period beginning in October 2013 because she had back surgery and needed his help, but by March 2014 Flores and the children had moved back in with Sugg.

some change. When the children lifted their hands to accept the change, they were looking at Sugg and their hands were shaking. Jorge also offered the children a cookie, but Sugg refused the offer, saying they could not have cookies because they would make a mess in the car. Jorge responded she was sure they were good kids, but Sugg said they were only good around other people and told Jorge she could take the children. Jorge telephoned the Department of Children's Services (DCS) and reported the bruising she had seen and provided DCS with Sugg's license plate number, but DCS did not follow up on that report.

In May 2014 Sugg and Flores went to a beauty school to enroll Sugg in a program offered at the school. They were accompanied by Jane Doe and John Doe 2. The school director, Ms. Armas, saw the children were so thin their skin hung off their arms and they were able to sit side by side in a normal chair. She tried to talk to the children, but they "had no energy whatsoever." John Doe's eyes were dark and sunken, and he had dark circles under his eyes. He also had bruises on his forehead and shins, and his skin had no color.[6]

Armas telephoned the San Bernardino County Department of Children and Family Services and reported Flores and Sugg, and told the authorities the children looked malnourished, emaciated, and looked as though they'd been in a concentration camp. Ms. Jones, a social services worker, went to Sugg's home on May 22, 2014, to investigate

---

[6] Other people at the beauty school were equally shocked by the children's appearance, looking like they had come out of a horror movie. One witness indicated they sat in a chair, holding hands, and did not move or make a sound, and "you could just see and sense the fear . . . of these kids."

the report, but Sugg told her that Flores was not home and said Jones would need Flores's permission to have contact with the children. Jones returned a week later, after obtaining Flores's permission, and saw the children in their backyard. John Doe 2 and Jane Doe appeared thin, and Jane Doe (then four years old) was wearing a diaper and not speaking. Sugg told Jones they received food stamps and WIC nutrition money for Jane Doe, and Jones checked and found there was adequate food in the house. Sugg told Jones that Sugg cared for the children during the day while Flores was in school, and claimed she fed the children during the day and typically at night. Jones told Sugg a public health nurse would be coming to their home.

Jones spoke with the nurse on June 5, 2014, who expressed concerns about possible malnourishment. Jones contacted Flores and told him he needed to get the children to a doctor as soon as possible. After several conversations, he told Jones he could not get an appointment until the end of June. Jones was uncomfortable with that timetable but Flores became upset at her insistence that immediate action was required and demanded to talk to a supervisor. That request was accommodated, and Flores then called Jones back and asked if taking the children to an emergency room would "just end this." Jones agreed, and Flores took the children to an emergency room.

The emergency room doctor diagnosed the children with severe malnutrition and neglect and told Jones the children needed to be admitted to a hospital within a week. The next day, Jones obtained a detention warrant and removed the children from Flores and Sugg's home. Jones stopped at a McDonald's with the children and John Doe 2 ate all of his breakfast, part of Jane Doe's breakfast, and said he was still hungry and

8

repeatedly asked for more food. Jane Doe vomited 20 to 30 minutes after eating. Jones also changed Jane Doe's diaper and notice she was inflamed and red, and flinched when Jones wiped her. Jane Doe's vagina appeared "a lot more open than what a four-year old's vagina . . . should look like, it looked like there was a hemorrhoid and discharge."

Dr. Massi, a forensic pediatrician, examined John Doe 2 and Jane Doe. He concluded their condition resulted from deprivation of adequate nutrition for a long period of time. Jane Doe's condition was "approaching death": she was four years ten months old but weighed only 22 pounds. John Doe 2, who was five years old but weighed just over 32 pounds, could have died had he not been hospitalized. Both had abnormally low heartbeats that were concerning, had developed Lanugo from prolonged malnutrition, and had suffered pancreatic injury. Jane Doe also had scarring and trauma to her genitalia consistent with having been penetrated, and showed behavioral signs of emotional trauma as well. John Doe 2 had scrapes and abrasions on his legs, left shoulder and forehead. Dr. Massi also explained the deleterious consequences of their condition over the remainder of their lives. The social worker who had investigated the condition of the children in mid-2012 saw them again after they had been detained in June 2014 and described them as "[u]nrecognizable" at that time.

D. Evidence from John Doe 1 and John Doe 2

A social worker interviewed John Doe 2, who described Sugg as his "new mom that's mean." John Doe 2 told the social worker that Sugg did not feed him or his brother, and John Doe 2 told Flores about that. John Doe 2 told the social worker Sugg made him stay outside and in the garage when Flores was gone, but Flores told John Doe 2 that he

9

did not want to stand up for the children because they were too old and did not behave for him. Sugg beat John Doe 1 and John Doe 2 because she wanted them to go outside. John Doe 2 told the social worker that, in one incident, Sugg beat him with a belt and didn't care that it made him bleed. Flores saw this and told her to stop, and physically assaulted Sugg, but Flores then left the house and left the children alone with Sugg.

John Doe 1 testified at trial that Sugg was abusive, including making them run around the car in the garage at night until they had to go to bed. He described an occasion when Sugg and Flores punished the children (because John Doe 2 took some cookies while John Doe 1 was supposed to be watching him) by making all three children spend part of the night in the garage without blankets. John Doe 1 testified he was scared because he thought the garage was full of spiders that would bite him, but Flores and Sugg were laughing about it.

Sugg did not feed them enough food,[7] and Flores was aware the children were not getting enough food. Sugg forced the children to do exercises all day while she watched television or laughed at them. She denied their requests for more food, and even denied requests for water and made them stand in the corner for asking for water. On one occasion, John Doe 1 saw Jane Doe drinking water from the toilet.

Sugg hit all three children, including the use of a belt and a hanger, and did so without explanation. Flores also hit the children. Sugg frequently made the children

---

[7] For example, John Doe 1 told a detective Sugg would give a him a third of a cup of macaroni and cheese for dinner, or would strip off the breading from a single corn dog and give him one half of the remaining meat for his meal while she consumed the rest.

stand in the corner, from breakfast until lunch, and John Doe 1 often did not know why. When Flores came home, he did not stop it, but made them continue standing in the corner. Sugg assigned John Doe 1 over 30 chores, including cleaning the toilets, which were impossible to complete in a single day. Sometimes he had to stand in the corner all day as punishment for not finishing his chores the previous day, and was only allowed to sit to eat his meals. Sugg also punished the children by forcing them to do exercises, like pushups, sit-ups, jumping jacks, or running in place, and sometimes required such exercise all day until it was bedtime. Flores was aware of Sugg's methods of punishment and disagreed with them; although Flores occasionally took the children away for a few days, he always returned to Sugg with the children.

E. The Defense

When asked if he had ever seen the children mistreated, a neighbor testified he never saw anything out of the ordinary.

II

ANALYSIS OF FLORES'S APPELLATE CLAIMS

A. The Aider and Abettor Instruction Was Proper

Flores argues the court's instructions were prejudicially erroneous because this permitted the jury to find Flores guilty of the nontarget offense of torture if it concluded (1) he aided and abetted Sugg in the target offense of felony child abuse and (2) the torture by Sugg was a natural and probable consequence of the felony child abuse he aided and abetted. He argues that, under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), that instruction was erroneous and the error cannot be deemed harmless.

11

*Aider and Abettor Liability*

An aider and abettor may be convicted for crimes committed by the direct perpetrator under two alternative theories: under direct aiding and abetting principles and under the so-called "natural and probable consequences doctrine." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.) Under direct aiding and abetting principles, the defendant is guilty of the intended (or "target") offense if he or she acted with knowledge of the criminal purpose of the direct perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the target offense. (*Id*. at p. 1118.) However, an aider and abettor can also be guilty of unintended crimes under the "natural and probable consequence" doctrine: when the aider and abettor acts with knowledge of the criminal purpose of the direct perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the target offense, he or she is guilty of both the intended (target) crime and any other offense (the "nontarget offense") committed by his or her confederate that was a "natural and probable consequence" of the target crime he or she aided and abetted. (*Id*. at p. 1117; accord, *People v. Sattiewhite* (2014) 59 Cal.4th 446, 472 [" ' "an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets" ' "].) Under the natural and probable consequences doctrine, "[b]ecause the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be

12

'equally guilty' with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.)

*Chiu*

In *Chiu, supra*, 59 Cal.4th 155, the court addressed whether an aider and abettor who knew of and intended to facilitate a target offense could be convicted of the nontarget offense of *premeditated* murder under the natural and probable consequences doctrine if the direct perpetrator committed premeditated murder and premeditated murder was a natural and probable consequence of the target crime. *Chiu* concluded that, although an aider and abettor may be convicted of premeditated murder under *direct* aiding and abetting principles, an aider and abettor cannot be convicted of the nontarget offense of first degree *premeditated* murder under the natural and probable consequences doctrine, but may only be convicted of second degree murder under that doctrine. (*Id*. at pp. 158-159, 165.)

*Chiu*, after noting it had not considered aider and abettor liability for first degree premeditated murder under the natural and probable consequences doctrine, articulated its reasons for concluding an aider and abettor cannot be convicted of the nontarget offense of first degree premeditated murder under that doctrine. (*Chiu, supra,* 59 Cal.4th at pp. 163-167.) *Chiu* noted the natural and probable consequences doctrine is a common law doctrine "firmly entrenched in California law" (*id*. at p. 163) but, because it is not part of the statutory scheme, the court "may . . . determine the extent of aiding and abetting liability for a particular offense, keeping in mind the rational function that the

13

doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application." (*Id*. at p. 164.) *Chiu* recognized aider and abettor culpability under the natural and probable consequences doctrine "is vicarious in nature" because it is " 'not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Quoting *People v. Canizalez, supra,* 197 Cal.App.4th at p. 852)]." (*Chiu,* at p. 164.)

*Chiu* explained the natural and probable consequences doctrine is based on the principle that liability extends to reach " 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.' [(Quoting *People v. Luparello* (1986) 187 Cal.App.3d 410, 439.)]" (*Chiu, supra*, 59 Cal.4th at pp. 164-165, italics added by *Chiu*.) *Chiu* concluded that, because the application of the natural and probable consequences doctrine does not depend on the foreseeability of every element of the nontarget offense but instead (at least in the context of murder under the natural and probable consequences doctrine) has focused on the reasonable foreseeability of the *actual resulting harm*, "the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that

14

would naturally, probably, and foreseeably result in an unlawful killing . . . is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder." (*Id*. at p. 165.) *Chiu* declared that limiting aider and abettor liability under the natural and probable consequences doctrine to second degree murder is:

> "consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citation.] [¶] However, *this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder.* First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, *whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state.* Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [(quoting *People v. Favor* (2012) 54 Cal.4th 868, 878)], *the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence.*" (*Chiu, supra*, 59 Cal.4th at pp. 165-166, italics added.)

15

*Analysis*

Flores, although acknowledging *Chiu* examined only an aider and abettor's liability for first degree murder on a natural and probable consequences theory, asserts the same rationale employed in *Chiu* should apply to an aider and abettor's liability for torture on a natural and probable consequences theory, because torture is also focused on the mental state of the direct perpetrator rather than on the pain inflicted on the victim. (See, e.g., *People v. Pre* (2004) 117 Cal.App.4th 413, 419-420.)

We conclude *Chiu* is limited to an aider and abettor's liability on a natural and probable consequences theory for first degree murder, and the animating concerns of *Chiu* are not sufficiently analogous to extend its application to an aider and abettor's liability on a natural and probable consequences theory for torture. First degree murder, apart from the felony-murder variety, requires both that the direct perpetrator acted with the specific intent to kill and that the direct perpetrator acted willfully, deliberately and with premeditation. (*Chiu, supra*, 59 Cal.4th at p. 166.) Our Supreme Court in *Chiu* held the latter components of that mental state (the willful, deliberate and premeditated aspect) was unique, explaining "[t]hat mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Ibid.*) However, although our Supreme Court concluded that policy reasons will excuse the aider and abettor from vicarious liability for the enhanced punishments applicable to first degree murder, it also concluded public policy

16

underlying aider and abettor liability does *not* excuse the accomplice entirely, but instead is satisfied by an accomplice's second degree murder conviction: "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 151-152 . . . [second degree murder is the intentional killing without premeditation and deliberation or an unlawful killing proximately caused by an intentional act, the natural consequences of which are dangerous to life, performed with knowledge of the danger and with conscious disregard for human life].)" (*Chiu, supra*, 59 Cal.4th at p. 165.)

In contrast, the crime of torture is akin to the crime of second degree murder and imposes punishment when the perpetrator causes a harm and has a specific mental state. Moreover, torture is not divided into degrees in which a uniquely subjective or personal intent element elevates the punishment above that imposed for a lesser form of torture. Finally, the public policy concerns discussed in *Chiu* are satisfied if Flores is held culpable (as an aider and abettor) for Sugg's conduct under the natural and probable consequences doctrine, because he aided and abetted the target offense of felony child

17

abuse and facilitated escalation of that conduct into the nontarget offense.[8] We conclude that, because *Chiu* approved liability for an aider and abettor for second degree murder under the natural and probable consequences doctrine, and the policy factors that animated *Chiu* to disapprove first degree murder culpability lack sufficient analogues to extend *Chiu* to aider and abettor liability for torture under the natural and probable consequences doctrine, the court did not err in instructing the jury on aider and abettor liability.

B. Substantial Evidence Supports the Convictions for Torture

Flores secondarily argues the evidence was insufficient to support the convictions for torture, because there is no substantial evidence either he or Sugg *intended* to inflict severe pain and suffering, and there was insufficient evidence they intended to inflict such pain *for* a purpose proscribed by statute.

*Legal Framework*

The crime of torture, as set forth in section 206, provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in

---

[8]     Our evaluation of Flores's argument, and our conclusion *Chiu's* limitations on the natural and probable consequences doctrine should not be extended to the offenses here, proceeds from the unstated assumption the jury found Flores guilty of felony child abuse (and the greater related crime of torture) on aiding and abetting principles rather than as the *direct* perpetrator of the felony child abuse and torture. However, we note the jury found *true* the allegations Flores *personally* inflicted great bodily injury in connection with the felony child abuse of the victims of the torture charged in counts 3 and 7, which undercuts the assumption the jury found him guilty based on aider and abettor principles. (See fn. 15, *post*.)

18

Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." Thus, "torture has two elements: (1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223.)

When evaluating a challenge to the sufficiency of the evidence, our role is limited. The appellate court " 'must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] [¶] . . . But it is the *jury,* not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury.' " (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 468, quoting *People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139.) We must " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" ' " (*People v. Davis* (1995) 10 Cal.4th 463, 509), and we may not reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Green* (1997) 51 Cal.App.4th 1433, 1437.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

19

*Analysis*

The first element of torture requires evidence Flores or Sugg *intended* to inflict extreme or severe pain.  (*People v. Burton* (2006) 143 Cal.App.4th 447, 452.)  The courts have recognized that "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense" (*People v. Pre, supra*, 117 Cal.App.4th at p. 420), and "[a]bsent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain." (*Burton,* at p. 452.)  Flores does not dispute that prolonged starvation or excessive corporal punishment can qualify as extreme or severe pain within the meaning of the torture statute,[9] and instead asserts only that there was no evidence they *intended* their conduct to inflict severe pain.  However, a jury may consider all of the circumstances (*People v. Misa* (2006) 140 Cal.App.4th 837, 843), including the severity of the injuries (*People v. Burton, supra,* 143 Cal.App.4th at p. 452) to determine whether the defendant intended to inflict cruel or extreme pain.  Here, two of the victims were so obviously emaciated that a lay witness testified it looked as though they'd been in a concentration camp, and the doctor who examined them testified Jane Doe's condition was "approaching death" and that John Doe 2 could have died had he not been hospitalized.

---

[9]    Both forms of abuse appear to qualify under the torture statute (see *People v. Lewis* (2004) 120 Cal.App.4th 882, 887 [stating in dicta that withholding food and water causing starvation can qualify as torture]; *People v. Assad* (2010) 189 Cal.App.4th 187, 196 [beating with hose and belt]), and there is ample evidence from which a jury could conclude Flores and Sugg inflicted both forms of physical abuse here.

There was substantial evidence from which a jury could infer Flores and Sugg intended to inflict cruel and extreme pain on these victims.

Flores alternatively argues there is no substantial evidence to satisfy the second prong of torture because, even assuming the evidence supported a finding that Flores and Sugg intended to cause cruel and extreme pain and suffering, there was no evidence they did so "for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." However, inflicting cruel and extreme pain and suffering to discipline children appears to be encompassed within the torture statute (see, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 685 [noting deliberate act of starving a child when employed as a behavior modification technique can qualify as torture]), and there is evidence from which a jury could have concluded Sugg employed beatings and food deprivation to discipline Flores's children, and Flores knew of and acquiesced to Sugg's methods.[10]

We conclude there was evidence from which a jury could have inferred Flores and Sugg inflicted great bodily injury on the victims with the intent to cause cruel and

---

10    For example, when Sugg elected to discipline all three children (because one had eaten a cookie without permission) by making them sleep in the garage without blankets, and despite the distress it caused the children, Flores and Sugg were in the house laughing about it. Sugg also disciplined the children by making them stand all day in a corner and, when Flores returned home, he did nothing to relieve the children of that punishment; instead, they continued to have to stand in the corner. Indeed, when John Doe 2 told Flores about Sugg's mistreatment of them, Flores said he would not stand up for the children because they were too old and were not well-behaved. On another occasion, when Sugg disciplined John Doe 2 by making him stand outside while everyone else was inside eating dinner, Flores did not countermand that discipline but instead told John Doe 2 to "just roll with it."

21

extreme pain and suffering for the purpose of persuasion, and therefore we affirm the convictions for torture as alleged in counts 3 and 7 against Flores.

III

ANALYSIS OF SUGG'S APPELLATE CLAIMS

Sugg argues section 273a is unconstitutionally vague under the rationale of *People v. Heitzman* (1994) 9 Cal.4th 189 (*Heitzman*) because it facially permits a defendant to be convicted if he or she "permits" a child to suffer the requisite injury at the hands of another without expressly limiting its reach to defendants who were under an affirmative duty to act to protect the child from such injury. Sugg alternatively asserts that, even assuming the statute can be given the judicial gloss *Heitzman* superimposed on section 368, reversal is still required because the trial court's instructions did not sua sponte incorporate that narrowing construction, and such omission cannot be deemed harmless under *Chapman v. California* (1967) 386 U.S. 18 or even under the lesser standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, and therefore asserts we should reverse all of the convictions.

A. Legal Framework

*Section 273a*

Section 273a has been described as "an omnibus statute that proscribes essentially four branches of conduct." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*). The court in *People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*), characterized those four branches of proscribed conduct as follows:

22

"As relevant here, [section 273a] provides: 'Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.'  [Fn. omitted.]"

The courts have also stated that "a violation of [section 273a] can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." (*People v. Smith* (1984) 35 Cal.3d 798, 806.)  In cases in which the defendant directly inflicted the requisite injury, the mens rea for the offense is the general intent to perform the underlying injurious act.  (*Sargent, supra,* 19 Cal.4th at pp. 1219-1224.)  However, in examining the so-called "indirect abuse" (*Valdez, supra,* 27 Cal.4th at p. 784) or " 'passive conduct' " (*Sargent,* at p. 1216) context, in which the defendant's actions or inactions indirectly cause the requisite harm to the child, *Valdez* concluded the mens rea for those aspects of section 273a criminalizing conduct that "willfully causes or permits" the requisite injury is a criminal negligence standard.  (*Valdez,* at pp. 787-791.)

*Heitzman*

In *Heitzman*, *supra*, 9 Cal.4th 189, our Supreme Court addressed a void-for-vagueness challenge to a section 368, a statute "based almost verbatim on section 273a . . . ."  (*Valdez, supra,* 27 Cal.4th at p. 788.)  *Heitzman* summarized the void-for-vagueness principles by explaining that a penal statute must " 'define the criminal offense

23

with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' (*Kolender v. Lawson* (1983) 461 U.S. 352, 357 . . . ; [citation].) [¶] It is established that in order for a criminal statute to satisfy the dictates of due process, two requirements must be met. First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed. [Citations.] Because we assume that individuals are free to choose between lawful and unlawful conduct, 'we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws trap the innocent by not providing fair warning.' (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 . . . ; [citation].) [¶] Second, the statute must provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement." (*Heitzman*, *supra*, 9 Cal.4th at p. 199.)

The *Heitzman* court evaluated a challenge to a segment of section 368, which facially criminalized passive conduct (resulting in the requisite injury) by a certain category of persons, under these void-for-vagueness principles. (*Heitzman*, *supra*, 9 Cal.4th at p. 193.) The court began by noting the structure of section 368 "reaches two categories of offenders: (1) *any person* who willfully causes or permits an elder to suffer, or who directly inflicts, unjustifiable pain or mental suffering on any elder, and (2) the elder's *caretaker or custodian* who willfully causes or permits injury to his or her charge, or who willfully causes or permits the elder to be placed in a dangerous situation." (*Id.* at p. 197.) The Supreme Court in *Heitzman* examined whether a defendant in the former

24

category, who the prosecutor acknowledged was *not* the victim's caretaker or custodian prosecutable under "that portion of the statute pertaining to caretakers or custodians" (*id.* at p. 206), could constitutionally be prosecuted as a member of the "any person" category of potential defendants when her culpability under section 368 rested on her *inaction.* (*Id.* at pp. 206-214; *Valdez, supra,* 27 Cal.4th at p. 785 ["[i]n [*Heitzman*] . . . we addressed the class of persons who, in addition to caretakers and custodians, had a duty to prevent elder abuse"].)

*Heitzman*, after observing the statute "may be applied to a wide range of abusive situations, including within its scope active, assaultive conduct, as well as passive forms of abuse, such as extreme neglect" (*Heitzman*, *supra*, 9 Cal.4th at p. 197), noted the defendant in that case was charged under former section 368, subdivision (a), with "willfully *permitting*" her elder father to suffer the requisite injury. (*Ibid.*) *Heitzman,* concluding "[i]t was thus her *failure to act*, i.e., her failure to prevent the infliction of abuse on her father, that created the potential for her criminal liability under the statute" (*ibid.*), therefore examined the constitutionality of that portion of section 368 imposing criminal liability for the failure to act as applied to "*any person* who willfully . . . permits" the requisite injury. (*Heitzman*, *supra*, 9 Cal.4th at p. 197.) *Heitzman* began with the recognition that, "[u]nlike the imposition of criminal penalties for certain positive acts, which is based on the statutory proscription of such conduct, when an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action." (*Ibid.*) The duty to take positive action can find its source in the statute itself. (*Id.* at p. 198 ["[a] legal duty

to act is often imposed by the express provisions of a criminal statute itself"].)

Alternatively, "[w]hen a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere" (*ibid.*), such as another criminal or civil statute or "a common law duty based on the legal relationship between the defendant and the victim, such as that imposed on parents to care for and protect their minor children." (*Ibid.*) *Heitzman* summarized the "void for vagueness" challenge presented there by stating that, "for criminal liability to attach under section 368[, subdivision] (a) for willfully permitting the infliction of physical pain or mental suffering on an elder, a defendant must first be under a legal duty to act. Whether the statute adequately denotes the class of persons who owe such a duty is the focus of the constitutional question presented here." (*Id.* at p. 199.)

*Heitzman* concluded section 368, subdivision (a), insofar as it purported to criminalize the willful failure to *prevent* abuse by the class of potential defendants encompassed by the "any person" language of section 368, would be void for vagueness without a limiting principle that a person falling within that class had an affirmative *duty to act* to prevent the harm to the victim, because neither the statutory language itself nor the case law construing it contained that limitation. (*Heitzman, supra,* 9 Cal.4th at pp. 199-207 ["In sum, contrary to constitutional requirements, neither the language nor subsequent judicial construction of section 368[, subdivision] (a) provides adequate notice to those who may be under a duty to prevent the infliction of abuse on an elder. Moreover, the statute fails to provide a clear standard for those charged with enforcing the law."].) However, *Heitzman* then explained that, although the court:

26

"determined that *the portion* of section 368[, subdivision] (a) purporting to impose on any person the duty to prevent the infliction of pain or suffering on an elder fails to meet the constitutional requirement of certainty[,] [b]efore declaring a statute void for vagueness, . . . we have an obligation to determine whether its validity can be preserved by 'giv[ing] specific content to terms that might otherwise be unconstitutionally vague.' (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 598 . . . ; [citations].) Indeed, we cannot invalidate a statute as unconstitutionally vague if ' "any reasonable and practical construction can be given to its language." ' (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143 . . . ; [citation].) [¶] As we shall explain, *the constitutionally offensive portion of the statute* is indeed susceptible of a clarifying construction . . . ." (*Heitzman*, at p. 209, italics added.)

The *Heitzman* court ultimately concluded the validity of the challenged portion of section 368, subdivision (a), could be preserved by giving the "constitutionally offensive portion of the statute . . . a clarifying construction," (*Heitzman, supra,* 9 Cal.4th at p. 209) and did so by superimposing on the "any person who willfully . . . permits" (*id.* at p. 197) portion of the statute a judicial gloss that limited its reach to those who had an affirmative duty to exert control over the actor causing or directly inflicting the injury on the victim. (*Id.* at pp. 212-214 ["[A] special relationship between the defendant and the person inflicting pain or suffering on the elder does provide the basis for a reasonable and practical interpretation of the statutory language at issue here. Under such a statutory construction, in order for criminal liability to arise for *permitting* an elder to suffer unjustifiable pain or suffering, a defendant must stand in a special relationship to the individual inflicting the abuse on the elder such that the defendant is under an existing duty to supervise and control that individual's conduct."].) Thus, *Heitzman* preserved the validity of the challenged portion of section 368, subdivision (a), by judicially construing

27

the "any person who . . . willfully . . . permits " portion of the statute to limit its reach to those persons who, by statutory or common law principles, had an affirmative duty to exert control over the actor causing or directly inflicting the injury on the victim.

B. The Due Process Claim

Sugg argues that, under *Heitzman,* section 273a is unconstitutionally vague. We begin by noting that Sugg raises no challenge to the constitutionality of those portions of section 273a, subdivision (a), that impose criminal penalties on that class of persons "who . . . willfully causes . . . or inflicts . . . unjustifiable physical pain or mental suffering" on a child, nor does she challenge to the constitutionality of those portions of section 273a, subdivision (a), that impose criminal penalties on the class of persons who "hav[e] the care or custody of any child" and either "willfully cause[] or permit[] the person or health of that child to be injured" or "willfully cause[] or permit[] that child to be placed in a situation [in which] his or her person or health is endangered."[11] Instead, Sugg challenges only the constitutionality of that aspect of section 273a, subdivision (a),

---

[11]    Other courts have rejected void-for-vagueness challenges to the liability imposed on persons having the care and custody of the child (see, e.g., *People v. Beaugez* (1965) 232 Cal.App.2d 650, 655-657), and *Heitzman* (although questioning the statute insofar as it imposed liability on a noncaretaker who "willfully permits" the victim to be injured) expressed no concerns with the "caretaker" aspects of the statute, because *Heitzman* expressly observed that "[b]ased on their status as [victim's] caretakers, felony criminal liability was properly imposed on Richard, Sr., and Jerry pursuant to section 368[, subdivision (a) for the role they played in bringing about their father's demise." (*Heitzman, supra,* 9 Cal.4th at pp. 214-215.) Indeed, *Heitzman* noted that once a defendant has assumed custody and care over the victim, the duty to affirmatively act to protect a victim is inherent in the statutory scheme. (*Id*. at p. 208 & fn. 16.)

28

which, as in *Heitzman*, imposes criminal penalties on "any person who . . . willfully . . . permits" the requisite injury to be inflicted.

We conclude that, because "the legislative history reflects that the language of section 368[, subdivision] (a) derives verbatim from the felony child abuse statute, section 273a" (*Heitzman*, *supra*, 9 Cal.4th at pp. 204-205), the same limiting construction adopted by *Heitzman* can appropriately be adopted as an overlay to "the constitutionally offensive portion of the statute" (*id.* at p. 209), and thereby preserve the constitutionality of section 273a. Accordingly, we follow our Supreme Court's analysis in *Heitzman* and construe that portion of section 273a that imposes criminal penalties on noncaretakers who "willfully permit[]" the requisite injury to be inflicted on a victim is limited to those persons who had an affirmative duty, under statutory or common law principles, to exert control over the actor who caused or directly inflicted the injury on the victim. As so construed, we follow *Heitzman* and conclude section 273a comports with relevant due process principles, and we therefore reject Sugg's assertion that section 273a is unconstitutional.

C. The Instructional Claim

Sugg argues that, even if adopting *Heitzman's* limiting construction preserves the constitutionality of that portion of section 273a—the section 368 counterpart of which was examined in *Heitzman*, reversal of her convictions is nevertheless required because there was instructional error in not instructing on the principles embodied in *Heitzman*. Sugg argues the trial court instructed the jury on all possible theories of guilt embodied in section 273a, including the "constitutionally offensive portion of the statute" (*Heitzman*,

29

*supra*, 9 Cal.4th at p. 209) of being a person who "willfully permit[ted]" the requisite injury to be inflicted. Sugg asserts that, as to *this* aspect of the court's instructions, the court erred by not sua sponte instructing the jury (under *Heitzman*) it could only convict Sugg as a "person who . . . willfully permit[ted]" the requisite injury to be inflicted if the jury also found Sugg had an affirmative duty, under statutory or common law principles, to exert control over Flores as the person who caused or directly inflicted the injury on the victims. Absent this clarifying instruction, Sugg asserts that (although it is possible the jury convicted Sugg based on one of the other correct theories) it is possible the jury convicted her on all counts under a legally erroneous theory, i.e. that she "willfully permit[ted]" Flores to inflict the injuries without a prefatory finding by the jury that she had a duty to control his actions. She asserts such error requires reversal unless this court can conclude, beyond a reasonable doubt, that the jury based its verdict on a legally accurate theory, and she argues the facts presented here cannot support that conclusion.

*No Sua Sponte Instructional Obligation Arose Under the Evidence Here*

We initially reject Sugg's claim that, on the facts presented here, the trial court was sua sponte obligated to provide a clarifying instruction that the jury could only convict Sugg if it found she had an affirmative duty to exert control over Flores. Although the sua sponte obligation requires a trial court to "instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case . . . [citations] . . . [and instruct] upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case" (*People v. Montoya* (1994) 7

30

Cal.4th 1027, 1047), that sua sponte obligation arises only for "an issue 'closely and openly' connected with the case." (*Id*. at p. 1050.)  Here, the evidentiary presentation, as well as the prosecution's theory, was that *both* Sugg and Flores either *directly inflicted or caused* the requisite injuries to the victims (by denying them adequate food and water and punishing them by forcing them to exercise until they were exhausted, or by hitting them or forcing them to sleep in the garage), or at a minimum that both Sugg and Flores had custody and care of the victims and *permitted* the other caretaker to inflict those injuries. On this set of facts, the "constitutionally offensive portion of the statute" (*Heitzman*, *supra*, 9 Cal.4th at p. 209) had no close and open applicability to this case, because the other statutory grounds were applicable to Sugg.  Because the theories under which Sugg was prosecuted fell squarely within those portions of section 273a that did *not* trigger the application of the "constitutionally offensive portion of the statute" (*Heitzman,* at p. 209), the principles adopted by *Heitzman* pertaining to which bystanders might also be liable for willfully permitting the injury to be inflicted were not so " 'closely and openly' connected with the case" (*Montoya, supra,* 7 Cal.4th at p. 1050) that the sua sponte instructional obligation arose in this case.[12]  (Cf. *People v. McKelvey* (1991) 230

---

[12]    Sugg's argument appears to be that there was some evidence from which the jury could have concluded Flores was the direct perpetrator of denying the children adequate food (because the children were denied adequate food even before Flores moved in with Sugg), and she merely permitted this pattern of conduct to continue after Flores and the children moved in with her.  Although that evidence (even if credited) may have provided an argument for exoneration under the prong of section 273a criminalizing the *direct* infliction of the requisite injury (*Sargent, supra,* 19 Cal.4th at pp. 1219-1224), the evidence was overwhelming that Sugg was a person who was at least a *joint* caretaker of the children, which triggered liability under those prongs in which a *caretaker or*

31

Cal.App.3d 399, 404 [court noted portion of statute potentially uncertain because it "does not describe those persons liable for permitting or causing a dependent adult to suffer" but rejected defendant's vagueness challenge because his conduct was clearly encompassed by a different portion of statute because he had care and custody of victim].)

---

*custodian* willfully permitted injury to his or her charge (*Heitzman, supra,* 9 Cal.4th at p. 197), and *not* a mere bystander to whom *Heitzman's* analysis might have sufficient application to trigger sua sponte instructional obligations. Under these facts, "the trial court was under no obligation to sift through the evidence to identify an issue that conceivably could have been, but was not, raised by the parties, and to instruct the jury, sua sponte, on that issue. (See, e.g., *People v. Wade* (1959) 53 Cal.2d 322, 334-335 . . . ['[T]he trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts. [¶] . . . [¶] . . . [The defendant's] theory . . . was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it and instructed the jury in accordance with it. Omniscience is not required of our trial courts.'].) The instructions given the jury were adequate in light of the evidence presented, and the trial court was under no obligation further to instruct the jury, sua sponte." (*People v. Montoya, supra*, 7 Cal.4th at p. 1050.)

32

*Any Instructional Defect Was Harmless*[13]

We alternatively conclude that, even if the court should have provided a different instructional charge to the jury, any instructional error was harmless beyond a reasonable doubt. The instructions included numerous legally correct theories on which a jury could have relied to convict Sugg of violating section 273a (and of the greater related offenses of torture): that Sugg was "the individual inflicting the abuse" (*Heitzman, supra,* 9 Cal.4th at p. 212) because she "willfully . . . inflict[ed] unjustifiable physical pain or mental suffering" on the victims or "willfully cause[d]" the victims to suffer that injury (§ 273a, subd. (a)), or that Sugg was a caretaker or custodian who *permitted* the victim to be injured or endangered. (*Heitzman,* at p. 214 ["the statutory scheme also provides that a *caretaker* or *custodian* who causes or permits injury or physical endangerment will incur criminal liability".]) However, we agree that, by including the "or permitted"

---

[13]  It appears the court's instructions, if the court had merely *omitted* the words "or permitted" from segment 1-B of its instruction, would have been accurate and required no amplification under *Heitzman*. Sugg's argument regarding sua sponte instructional error—that once the court included the "willfully . . . permits" prong it was *also* required to instruct the jury to determine whether the defendant owed a duty to *control* the actions of the actual perpetrator—does *not* assert (nor did *Heitzman* suggest) a similar limiting principle with its corresponding instructional obligation applies to *caretakers* who "willfully permit[]" the child to suffer such injury. Indeed, *Heitzman* appears to accept that, unlike the bystander liability on which *Heitzman* was focused, the duty of a child's caretaker to protect against injury is *not* a duty to control the acts of a third party, but is instead a duty to protect the victim's well-being. (See *Heitzman, supra*, 9 Cal.4th at p. 198 [noting a "criminal statute may also embody a common law duty based on the legal relationship between the defendant and the victim, such as that imposed on parents to care for and protect their minor children," and citing with approval *People v. Burden* (1977) 72 Cal.App.3d 603, 615, in which the court noted defendant father was under common law duty to care for young son].)

33

language, when divorced from that aspect of the instruction describing Sugg's liability in her capacity as a caretaker or custodian for the victims *and* without inclusion of *Heitzman's* limiting principles, the jury was provided a potentially legally incorrect theory for convicting Sugg.

However, even when a jury *is* provided a potentially legally incorrect theory, a reviewing court may nevertheless affirm when that error can be deemed harmless beyond a reasonable doubt. (*People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306 [harmless beyond a reasonable doubt standard applies when prosecutor presents both correct and incorrect theories of guilt to jury].) As explained by the court in *People v. Brown* (2012) 210 Cal.App.4th 1, 12-13:

> "Although the general rule in cases involving a legally inadequate theory 'has been to reverse the conviction because the appellate court is " 'unable to determine which of the prosecution's theories served as the basis for the jury's verdict' " ' [(quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1130)], even this type of error can, in an appropriate case, be harmless: 'If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary [with respect to the element of the crime at issue], the erroneous . . . instruction [on that element] was harmless.' (*People v. Chun* (2009) 45 Cal.4th 1172, 1205 . . . ; see *People v. Harris* (1994) 9 Cal.4th 407, 424 . . . [harmless error test traditionally applied to misinstruction on the elements of an offense is 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" ' (quoting *Chapman v. California*[*, supra,*] 386 U.S. 18, 24) . . . .) ' "To say that an error did not contribute to the verdict . . . is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." ' [(Quoting *People v. Harris*, *supra*, at p. 430, italics omitted.)]"

We conclude the inclusion of the legally erroneous theory was harmless beyond a reasonable doubt. The evidence showed Sugg was a direct perpetrator of the requisite

34

injuries caused by depriving the children of the necessary nutrition,[14] and/or the children's caretaker liable insofar as Sugg permitted them to suffer the requisite injuries, and the closing arguments of counsel never suggested Sugg's liability was premised on anything other than her conduct as a direct perpetrator or caregiver for the children. (Cf. *People v. Aguilar* (1997) 16 Cal.4th 1023, 1036 [court considers closing argument to evaluate whether legally erroneous alternative theory was harmless].) The prosecution's summation emphasized her role as the direct perpetrator of starving the children, and well as her role as a caretaker of the children, and Sugg's counsel did not argue she was not a direct perpetrator in the level of nutrition given to the children but instead merely argued she was herself anorexic and believed the level of nutrition given to the children was appropriate.

We reject Sugg's argument that the inclusion of the legally erroneous theory cannot be deemed harmless beyond a reasonable doubt. Her principal argument appears to rest on her claim that, because the evidence was "weak and conflicting" on whether she

---

[14]    When "other aspects of the verdict . . . leave no reasonable doubt" that the jury rested its verdict on a legally correct theory, the inclusion of a legally incorrect theory may be deemed harmless beyond a reasonable doubt. (Cf. *People v. Chun, supra,* 45 Cal.4th at p. 1205.) Here, other aspects of the verdict reinforce our conclusion the jury based its verdict on a legally correct theory that Sugg directly caused the injuries. The jury was instructed on, and found true, the allegations that Sugg *personally* inflicted great bodily injury on Jane Doe in connection with Sugg's section 273a, subdivision (a), offense against Jane Doe, and that Sugg *personally* inflicted great bodily injury on John Doe 2 in connection with Sugg's section 273a, subdivision (a), offense against John Doe 2. The determination Sugg personally inflicted the injuries associated with the section 273a offenses appears incompatible with a determination she was guilty of the underlying offenses as a mere bystander who failed to prevent Flores from inflicting the great bodily injuries.

was a caregiver for the victims (in that the evidence permitted the conclusion she acted as the primary caregiver only two days week while Flores was home providing care for the victims for the rest of the time), it was possible the jury convicted her of the offenses as a mere bystander who "permitted" Flores to inflict the injuries on the victims. However, that argument disregards that the evidence overwhelmingly demonstrated *she* was "the individual inflicting the abuse" (*Heitzman, supra,* 9 Cal.4th at p. 212), which renders her status as a caregiver irrelevant.[15]

Moreover, even assuming the jury concluded Sugg merely "permitted" (rather than directly inflicted) the requisite injury, the fact Flores was *a* caregiver (or even the principal caregiver) is irrelevant to whether Sugg *also* qualified as a caregiver who could be liable under section 273a for permitting the children to suffer the requisite harm, and the evidence overwhelmingly established she was *a* caregiver for the victims: (1) Flores and Sugg lived together with the children as a family unit for many months; (2) the children described her as their "new mom" and as "act[ing] as [their] stepmom"; (3) Sugg was the *sole* caregiver for at least part of the week, and (4) Sugg dispensed discipline for the children while they lived under the her roof. The fact Sugg was not their biological

---

15     John Doe No. 2 told the social worker Sugg was mean and personally denied food to them, and personally used corporal discipline with a belt and made him bleed. John Doe No. 1 testified Sugg personally denied adequate food to them (and even scolded him when he tried to share his food with his siblings) even though there was food in the refrigerator, personally used a belt to inflict corporal discipline, and also punished the children by requiring them to sleep in the garage (as a punishment for one of them taking some cookies) or stand in a corner for an entire day or do exercises until they were "falling down."

mother, and not wed to Flores, is irrelevant to whether she had "care and custody" over the victims within the meaning of the statute. (*People v. Morales* (2008) 168 Cal.App.4th 1075, 1083 [" '[t]he terms "care or custody" do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver' "].) As the court explained in *People v. Perez* (2008) 164 Cal.App.4th 1462, 1476: "[T]he relevant question in a situation involving an individual who does not otherwise have a duty imposed by law or formalized agreement to care for a child (as in the case of parents or babysitters), is whether the individual in question can be found to have undertaken the attendant responsibilities at all. 'Care,' as used in the statute, may be evidenced by something less than an express agreement to assume the duties of a caregiver. That a person did undertake caregiving responsibilities may be shown by evidence of that person's conduct and the circumstances of the interaction between the defendant and the child; it need not be established by an affirmative expression of a willingness to do so. [Fn. omitted.]" For all of these reasons, we are convinced beyond a reasonable doubt that inclusion of the legally erroneous theory was harmless beyond a reasonable doubt.

## DISPOSITION

The matter is remanded to the trial court with instructions that the court shall correct the minute orders and abstracts of judgment to reflect imposition of life terms on counts 3 and 7 as to Flores and counts 1 and 5 as to Sugg and, as so modified, the judgment is affirmed.

                                                        McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069899 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1403349) |
| ERIK AUSTIN FLORES et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed July 29, 2016, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1105(a), for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

BENKE, Acting P. J.

Copies to: All parties