Filed 3/25/22  P. v. Simmons CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B307747 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA464696) |
| v. | |
| RON SIMMONS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Judgment of conviction affirmed and remanded with directions.

Michael S. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Ron Simmons on one count of actively participating in a criminal street gang conspiracy, 10 counts of first degree burglary, two counts of first degree robbery, two counts of attempted first degree robbery, and one count each of torture and mayhem in connection with one of the burglaries. The jury also found true gang allegations on each of the burglary, robbery, and attempted robbery counts. The trial court sentenced Simmons to a determinate term of 46 years 4 months, and a concurrent indeterminate term of 15 years to life.

Simmons contends substantial evidence did not support most of his convictions or the true findings on the gang allegations on the torture and mayhem convictions. Simmons also contends the trial court erroneously imposed an additional 35 years of imprisonment. And Simmons contends the court should have stayed execution of the sentence on his conviction for actively participating in a criminal street gang conspiracy (count 1). We agree with the last contention only and remand for the trial court to correct this and another sentencing error.

Meanwhile, while this appeal was pending, the Legislature enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3), which, among other changes to the sentencing laws, requires that facts underlying any circumstance in aggravation used to impose the upper term must have been stipulated to by the defendant or have been found true beyond a reasonable doubt. Simmons argues Senate Bill No. 567 applies retroactively to his sentence and asks us to direct the trial court to impose the middle term instead of the upper term on two of his convictions. We agree Senate Bill No. 567 applies retroactively

and direct the trial court to resentence Simmons under this and any other newly enacted ameliorative legislation that may apply.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Simmons Commits a String of Burglaries and Robberies*

Between October 2017 and October 2018 Simmons and other members of the Six Deuce Brims criminal street gang committed a series of burglaries in the San Gabriel Valley. Because in four of the burglaries the occupant of the residence was home, Simmons and his fellow gang members also committed, or attempted to commit, robbery. In two of those four robberies or attempted robberies, they brutally attacked the victims.

Simmons and his confederates generally followed a common plan. They convened at the Long Beach home of Deondra Johnson, a member of the Six Deuce Brims gang, late in the afternoon or early in the evening, and drove 15 to 20 miles to a city in the San Gabriel Valley. After nightfall, without knocking on the door they broke a glass door or window to get into the house; ransacked the rooms and stole as much jewelry, cash, and other transportable items as they could; usually left within 10 minutes; and drove back to the Long Beach area before dispersing. If people were home during the burglary, the gang members intimidated, threatened, and sometimes beat them to learn where they kept cash and other valuables. None of the victims could identify the perpetrators.

3

B. *Detectives Investigate and Conclude Simmons and His Fellow Gang Members Committed the Crimes*

Detective Andrew Yzabal monitored social media activity of Six Deuce Brims gang members, analyzed the records of cell phones associated with members of the gang, and found evidence implicating Simmons in the burglaries and robberies. Based on his analysis of cell phone records, Detective Yzabal concluded that every time members of the Six Deuce Brims gang left their neighborhood in south central Los Angeles and traveled to the San Gabriel Valley, the open lines between the gang members corresponded to crimes "happening close" to those areas of phone activity. Call detail records showed that the phones of Simmons and other Six Deuce Brims gang members traveled to each targeted residence near the time of the burglary and subsequently traveled back to the neighborhood of the gang or one of its members. Video surveillance from two of the burglarized homes and from the apartment of one of the gang members provided further incriminating evidence.

C. *A Grand Jury Indicts Simmons*

A grand jury indicted Simmons on one count of actively participating in a criminal street gang conspiracy and multiple counts of burglary, robbery, and related crimes. The indictment alleged Simmons committed most of the offenses for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. (Penal Code, § 186.22, subd. (b).)[1] The People proceeded to trial on the following

---

[1] Undesignated statutory references are to the Penal Code.

4

charges: one count of actively participating in a criminal street gang conspiracy (§ 182.5, count 1);[2] 11 counts of first degree burglary of an inhabited dwelling house (§ 459, counts 4, 5, 6, 7, 9, 11, 13, 15, 17, 18, and 19);[3] two counts of first degree residential robbery (§ 211, counts 3 and 16); two counts of attempted first degree residential robbery (§§ 211, 664, counts 8 and 12); elder abuse of one of the victims, Bong Rhee (§ 368, subd. (b)(1), count 10); mayhem of another victim, Tran Truong (§ 203, count 14); and torture of Truong (§ 206, count 20).[4]

D.    *The People Present Evidence of Simmons's Guilt*

The victims of the burglaries and robberies testified about what they saw when the intruders entered their home or, if they were not home, what they found when they returned. The mode of entry was usually a smashed glass door or window in the back

---

[2]    The court renumbered the counts as they appeared in the indictment for the jury.

[3]    For five of those counts, the indictment alleged a person was present during the commission of the burglary. First degree burglary is a violent felony under section 667.5, subdivision (c)(21), "wherein it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary." (See *People v. Denard* (2015) 242 Cal.App.4th 1012, 1025.)

[4]    The People did not proceed on count 2 (which involved the burglary of Amy Ning's residence). Instead, they introduced evidence of that burglary under Evidence Code section 1101, subdivision (b), to show identity, intent, or common plan. (See *People v. Erskine* (2019) 7 Cal.5th 279, 295.)

of the house.  The victims who were present when the burglaries occurred described the perpetrators as two to three young men who wore black clothing, black shoes, and a mask that revealed only the black skin around the eyes underneath the mask.  The two victims who suffered physical injuries, Bong Rhee and Tran Truong, also described how they were attacked.

Rhee, an 84-year-old man, testified that, after he went to bed at 9:00 p.m. on August 24, 2018, he woke up to flashlights in his room.  Two men had entered his home, and one of them held a steel crowbar.  Both men proceeded to beat him with their hands.  Rhee fell to the ground, and the men continued to beat, kick, and stomp on him.  The two men ransacked his drawers and searched his closets.  At some point, Rhee lost consciousness.

Truong, a 59-year-old woman who was five feet one inch tall, testified that on September 10, 2018, two men woke her up from deep sleep sometime after 9:00 p.m.  The men, who appeared "thin and tall," were completely covered in black.  One of them carried a yellow crowbar, approximately one to two feet long.  The man without the crowbar pulled her up from the bed, pushed her to the ground, and asked, "Where is your money?"  Truong replied, "No, I don't have any money."  When Truong looked at the man, the man hit her in the eyes multiple times and said, "You cannot look at me."  When Truong tried to open her mouth to cry because she "was in so much pain," the man hit her mouth and said, "You cannot cry, you cannot cry."  The man pinned her to the ground with one foot and repeatedly kicked her and stomped on her with the other.  Truong thought they were going to beat her to death.  The man then covered Truong's face with a blanket and hit her in the head.  Meanwhile, the other man started "striking everywhere" and searched the closets.

6

Before the men left, they pushed a chest of drawers onto Truong's back. The men took $3,000 in cash and jewelry. Truong suffered a blood bruise to her head, impaired vision, and broken ribs. She also lost seven or eight teeth.

In addition to the victims' testimony, three gang experts testified about the Six Deuce Brims' culture of violence, the modus operandi its members followed when committing burglaries, the cell phone records that showed Simmons's proximity to each of the burglaries and robberies, and surveillance video and social media posts that further established Simmons participated in the crimes. Officer Dexter Navarro testified that the Six Deuce Brims, or Harvard Park Brims, was a criminal street gang named after its territory of 62nd Street and Harvard Park and that the gang aligns with other Brims gangs in the surrounding neighborhoods of south central Los Angeles. He stated the primary activities of the gang are vandalism, armed robberies, burglaries, carjackings, shootings, narcotic sales, and murder. He explained a gang member earns respect by "putting in work" or "doing licks," which in "street vernacular" meant "robbing or doing shootings." He stated that when a "young gangster" earns respect he can elevate his status and become a leader of a crew to go out and commit other crimes and that robberies and burglaries can earn a gang member respect. Officer Navarro explained, "The more violent the act, . . . the more respect you get." Detective Allen Hsiao testified that members of the Six Deuce Brims gang establish authority and create an atmosphere of fear and intimidation that will make potential victims and witnesses reluctant to report crimes committed by members of the gang.

Officer Navarro also testified, based on more than two dozen contacts with Simmons since 2016, Simmons's tattoos, and the people with whom Simmons associated, that Simmons was a member of the Six Deuce Brims gang with a moniker of "Tiny E," which was short for Tiny Evil. A photograph on Simmons's social media account showed him holding out "a handful of money." The officer stated that this photograph benefits the gang because it showed "success" and that it "entices" younger kids to join the gang. The photograph also depicted a bottle of promethazine, which the officer explained gang members usually obtained through burglaries and sold for income. Officer Navarro testified that Simmons drove a "higher-end gold Jaguar" and that driving such a car benefits gang members because "it bolsters the reputation with the hood, within their gang, their territory, [and] their allies." Officer Navarro said he commonly saw gang members with "higher-end vehicles" and jewelry after someone in the gang had been arrested for burglary. Officer Navarro added that, even if a gang member who committed a burglary did not end up stealing anything, such conduct still would benefit the gang and enhance the gang member's reputation because the crime indicated the gang member was "willing to go . . . down" for the gang and helped him gain the trust of fellow gang members. The officer concluded that, hypothetically, if a Six Deuce Brims gang member, accompanied by two or three fellow gang members, drives to the San Gabriel Valley and commits a burglary, the crime benefits the gang because the items taken can be converted to cash, and the cash can be used to rent vehicles and purchase firearms or narcotics, which gang members can sell to "further fund their criminal activity."

8

Officer Navarro further testified that, "when committing a crime such as burglary, each gang member can assume different roles," such as the driver, the contact person who "verifies to see if there is anybody home," and the lookout.  Then, the officer explained, "once entry is made," the gang can have "two or three people in the house" to enable them to cover more ground and steal more items.  Officer Navarro stated gang members like to commit crimes with other gang members because "they're already vetted," which meant, if they get caught, "they know how not to snitch or tell on each other."

Detective Yzabal testified that, typically, four gang members drive to the location of the burglary in a rental car with tinted windows.  The gang members keep an "open line" between the lookout (who has a police scanner), the driver, and at least one person inside the house.  Gangs like the Six Deuce Brims target people of Asian descent "because of the belief that many Asians don't believe in banks and keep large amounts of cash on hand and typically have . . . large amounts of . . . expensive jewelry."  Detective Yzabal also described the distinguishing features of burglaries committed by the members of the Six Deuce Brims:  The burglaries occur at night, and the gang members do not knock on the door to see if anyone is home before they break in.  The burglary crews also usually carry a crowbar, as opposed to knives, screwdrivers, or other concealable tools that other gangs like to use.

Detective Yzabal mapped the cell phone activity of Simmons and his associates in the gang and concluded the activity corresponded to the burglaries and robberies in this case.  The detective explained that, when a person makes a cell phone call, the signal is sent to the strongest cell tower, which can

9

indicate the general location of the cell phone. Using maps and diagrams, Detective Yzabal explained how Simmons's phone records showed that, in each instance, his phone and the phones of his fellow gang members convened at Johnson's apartment in Long Beach, traveled to a city in the San Gabriel Valley, remained in the vicinity of the targeted residence for the precise amount of time of the burglary, and then travelled back to the Long Beach area.

For example, on December 27, 2017 the call detail records of Simmons's phone showed that his phone and the phone of Devin Garner, another member of the Six Deuce Brims gang, established an open line from 5:11 p.m. to 5:27 p.m. Both phones transmitted off the same cell tower approximately 0.2 miles away from the residence of Tracy Luong, which was burglarized that evening between 5:09 p.m. and 5:36 p.m.

On August 24, 2018 at approximately 7:00 p.m., the telephones associated with Simmons, Johnson, and two other gang members registered activity in Johnson's neighborhood in Long Beach. At 8:30 p.m. the signals transmitting from the four cell phones indicated the phones had traveled together to the area of Rhee's house in Temple City. An open line between two of the gang members' phones at 9:12 p.m. corresponded to the time of the 9:10 p.m. burglary that evening. Video surveillance of Rhee's residence showed an SUV parked in front of the residence for the duration of the burglary and then sped off around the time the phones ended the open line call.

And on September 10, 2018 call detail records of phones associated with Simmons, Johnson, and another gang member showed they all traveled together to the location of Truong's home (after having committed another burglary a few miles

10

away) and traveled back to the Long Beach area after the burglary. An open line between the phones of two of the gang members transmitted off the same cell tower less than a quarter mile from Truong's home and corresponded to the time of the burglary. The call lasted 43 minutes, much longer than most of the other open line calls, which was consistent with the extra time it took for Truong's assailant to beat and torture her.

To confirm the reliability of the call detail records, the People introduced the call detail records of Simmons's phone related to an uncharged burglary. Detective Yzabal explained that, on October 27, 2017, at approximately 5:15 p.m., the call detail records of Simmons's phone indicated his phone traveled from an area in south central Los Angeles to an area near Amy Ning's house in Temple City. Simmons's cell phone received a call close to the time of the burglary at 7:10 p.m. that lasted approximately 18 minutes, which matched the time of the burglary, and the cell tower that transmitted the call was only 0.2 miles from Ning's residence. After the burglary, at approximately 7:30 p.m., the call detail records showed Simmons's phone traveled back to an area in south central Los Angeles, where police arrested Simmons—two blocks from where police found a safe Ning reported had been stolen. One of the officers found two crowbars nearby and recovered $35,000 of cash strewn across the street; Simmons had in his possession $8,000, five rings, a Rolex watch, pendants, and earrings.

Surveillance video from one of the burglarized homes showed an image of one of the intruders wearing shoes with distinctive markings that were consistent with shoes Simmons wore (as captured by surveillance video of Simmons walking around Johnson's apartment). A still image from a surveillance

11

video of another burglary showed three individuals, one of whom (again) wore shoes that resembled the shoes Simmons wore at Johnson's apartment. Another still image showed an individual who had facial features that resembled Simmons's, including a distinctive gap in the middle of his mustache. Finally, still images from surveillance video of Johnson's apartment shortly after one of the burglaries showed Simmons carrying a box of "miscellaneous items" into the apartment.

Simmons's social media account provided further evidence that pointed to his participation in at least one of the burglaries. On September 25, 2018, shortly before 7:00 p.m., Simmons received a message on his social media account: "Where you at?" Simmons replied, "OMW to work," which Detective Yzabal explained stands for "On my way to work." According to the detective, gang members commonly refer to crimes they commit as "work" because "they do it on such a regular basis and that's their main income that they depend on." Less than two hours after that social media message, call detail records indicated Simmons and his fellow gang members burglarized the home of Baoying Zhang.

E.    *The Jury Convicts Simmons, and the Trial Court Sentences Him*

The jury found Simmons guilty on the counts, except for the burglary of one of the residences and elder abuse of Rhee

(counts 7 and 10). The jury also found true all the gang allegations.

As we will discuss in more detail, the trial court sentenced Simmons to an aggregate determinate prison term of 46 years 4 months and a concurrent indeterminate term of 15 years to life. Simmons timely appealed.

## DISCUSSION

Simmons argues substantial evidence did not support his convictions for torture, mayhem, burglary, or robbery, or the true findings on the gang allegations on his torture and mayhem convictions. He also contends the trial court committed two sentencing errors. We conclude that substantial evidence supported the challenged convictions and true findings and that, except for the sentence on the conviction for actively participating in a criminal street gang conspiracy and one of the burglary convictions, the trial court did not err in sentencing Simmons. In supplemental briefing, Simmons argues Senate Bill No. 567, which became effective January 1, 2022, applies to his sentence and asks us to remand the matter and direct the trial court to impose the middle term instead of the upper term on two of the counts. We conclude Senate Bill No. 567 applies retroactively to this case and direct the trial court to correct the sentencing errors and to resentence Simmons.

### A. *Standard of Review*

"'When reviewing a challenge to the sufficiency of the evidence, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

13

could have found the essential elements of the crime beyond a reasonable doubt.'" [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for '"substantial evidence—that is, evidence which is reasonable, credible, and of solid value'" that would support a finding beyond a reasonable doubt.' [Citation.] In doing so, we 'view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.' [Citation.] 'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence.'" [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) "'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; see *People v. Ware* (2020) 52 Cal.App.5th 919, 937, review granted Dec. 9, 2020, S263923.)

> B. *Substantial Evidence Supported Simmons's Conviction for Torture*

>> 1. *The Perpetrator Had the Specific Intent To Commit Torture*

Section 206 provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the

14

person of another, is guilty of torture."[5]  (See *People v. Pearson* (2012) 53 Cal.4th 306, 325; *People v. Odom* (2016) 244 Cal.App.4th 237, 246; *People v. Pre* (2004) 117 Cal.App.4th 413, 419.)  The crime of torture has two elements:  "'(1) [A] person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.'"[6] (*People v. Flores* (2016) 2 Cal.App.5th 855, 871.)

Simmons does not challenge the jury's finding on the first element, that the perpetrator inflicted great bodily injury on Truong.  Nor does he challenge the jury's finding on the first part of the second element, that the perpetrator inflicted injury with the specific intent to cause cruel and extreme pain and suffering. He argues the evidence "did not show that the perpetrator had the necessary specific intent to commit torture upon the victim" because there was no evidence the perpetrator "had a motive or reason to seek revenge," tried "to persuade the victim . . . or extort money or property from her," or had "a sadistic purpose."

The evidence amply supported the jury's finding.  "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre, supra,* 117 Cal.App.4th at p. 420; see *People v. Flores, supra,* 2 Cal.App.5th at p. 871; *People v. Odom, supra,*

---

[5]     Section 12022.7, subdivision (f), defines great bodily injury as "a significant or substantial physical injury."

[6]     Sadistic purpose means "'the infliction of pain on another person for the purpose of experiencing pleasure.'"  (*People v. Smith* (2015) 61 Cal.4th 18, 53.)

15

244 Cal.App.4th at pp. 246-247.) Here, the gang member who attacked Truong hit her in the face with enough force to knock out at least seven of her teeth, kicked her hard enough to crack her ribs, stomped on her, covered her with a blanket and hit her in the head with sufficient force to cause a blood bruise, and for good measure put a heavy chest of drawers on her back to make sure she could not move when the gang members left. A reasonable jury could conclude from this evidence that the only purpose for these repeated blows, inflicted in different ways, was to satisfy the perpetrator's perverse desire to see Truong suffer. (See *People v. Massie* (2006) 142 Cal.App.4th 365, 373, 375-376 ["a reasonable jury could have concluded that the gratuitous and repeated acts of extreme brutality," including the use of different methods of inflicting pain, "were committed for the sadistic purpose of providing defendant pleasure"]; *People v. Misa* (2006) 140 Cal.App.4th 837, 843 [the level of violence, the nature of the victim's injuries, and the manner in which the defendant inflicted them, and the defendant's "callous indifference" to the victim's need for medical intervention, provided sufficient evidence the defendant acted with "'the cold-blooded intent to inflict pain for personal gain or satisfaction'"].) That Truong's assailant preceded each punch with a warning not to do something that was beyond her control, such as crying out in pain or looking at him as he stood in front of her, reinforced the sadistic nature of the beating. (See *People v. Healy* (1993) 14 Cal.App.4th 1137, 1142 [under section 206, "the trial court could reasonably have found that [the defendant] derived a perverse pleasure from beating [the victim]," who "did nothing to provoke the beatings, and testified [the defendant] would 'seem content' after he kicked or hit her"].)

16

Moreover, the bulk of the attack occurred after Truong had told the gang members she did not have any money in the house. The jury reasonably could have inferred the perpetrator continued to beat up Truong to persuade her to disclose the location of money or items to steal or to punish her for not revealing where she kept her money. (See *People v. Flores*, *supra*, 2 Cal.App.5th at p. 872 ["there was evidence from which a jury could have inferred [the defendants] inflicted great bodily injury on the victims with the intent to cause cruel and extreme pain and suffering for the purpose of persuasion"]; *People v. Massie*, *supra*, 142 Cal.App.4th at p. 375 [sequence of events supported a reasonable inference that the defendant "intentionally inflicted cruel and extreme pain in an effort to persuade [the victim] to relent and submit to rape"].)

Simmons argues "there was no evidence of a sadistic purpose" because "the force used during the assault was undertaken to subdue and instill fear in the victim to commit the robbery." The record does not support Simmons's argument. As discussed, Truong complied with all of the perpetrator's demands, and even after he had pinned her to the ground with his foot, he continued to beat her. Truong never resisted or posed a physical threat to her assailant or his crowbar-wielding confederate.

### 2. *Torture Was a Natural and Probable Consequence of the Target Crimes*

Simmons next argues the "evidence presented at trial was not sufficient to show the torture was a natural and probable consequence of the residential robbery and burglary that occurred in the Truong residence." Again, substantial evidence supported the jury's finding.

17

"'[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime [nontarget crime] that is the "natural and probable consequence" of the target crime.' [Citation.] To find an aider and abettor guilty of a nontarget crime under the natural and probable consequences theory, the jury must find that the defendant aided and abetted the target crime, that a coparticipant in the target crime also committed a nontarget crime, and that this nontarget crime was a natural and probable consequence of the target crime the defendant aided and abetted." (*People v. Hardy* (2018) 5 Cal.5th 56, 92; see *People v. Flores, supra*, 2 Cal.App.5th at pp. 866-867.)

"'A nontarget offense is a '"natural and probable consequence"' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability '"is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."' [Citation.] Reasonable foreseeability "is a factual issue to be resolved by the jury."'" (*People v. Smith* (2014) 60 Cal.4th 603, 611; see *People v. Flores*, *supra*, 2 Cal.App.5th at pp. 867-868; *People v. Weddington* (2016) 246 Cal.App.4th 468, 486-487.) "'[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough."'" (*People v. Medina* (2009) 46 Cal.4th 913, 920; see *People v. Abelino* (2021) 62 Cal.App.5th 563, 581.)

18

Substantial evidence supported the jury's finding Simmons reasonably should have contemplated that torture was a possible consequence of the planned burglary and robbery. According to Officer Navarro, the methodology of Six Deuce Brims gang members when committing a burglary included forcibly entering a residence at night without knocking, just as the gang members who burglarized Truong's residence did. The perpetrators also covered themselves completely in black, indicating they anticipated Truong would see them once they broke into her house, and carried a long crowbar to strike anyone or anything in their way. (See *People v. Nguyen* (1993) 21 Cal.App.4th 518, 532-533 ["'When robbers enter the home, the scene is all too often set for other and more dreadful crimes. . . . In the home, the victims are particularly weak and vulnerable and the robber is correspondingly secure. The result is all too often the infliction of other crimes on the helpless victim.'"].)[7]

Moreover, members like Simmons of a criminal street gang like the Six Deuce Brims should expect additional violence may occur, as happened during the burglary of Rhee's house three weeks prior to the burglary of Truong's house. (Cf. *People v. Weddington*, *supra*, 246 Cal.App.4th at p. 488 ["[g]iven [the

---

[7] That the perpetrator did not actually use the crowbar to hit Truong does not mean the jury could not consider it, along with the other circumstances of the crime, to find Simmons should have anticipated additional crimes of violence might occur. (See *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1451-1452 [where gang members brought a baseball bat to attack rival gang members, the "fact that the baseball bat was never actually used in the confrontation does not change the analysis" that the defendant was "properly found liable for the homicide as a natural and probable consequence of the planned gang assault"].)

defendants'] flight from police after [a previous] attempted burglary . . . it was certainly predictable that [the accomplice] would again attempt to evade police after the [later] burglary"].) Indeed, because the call detail records indicated Simmons participated in the Rhee burglary, the jury reasonably could have inferred Simmons either personally assaulted Rhee, witnessed the assault, or heard about it. And, as Officer Navarro explained, the perpetrators had every reason to brag about the additional crimes they committed inside Rhee's home to earn respect within the gang. Simmons, at a minimum, would have known all that.

Without citing any authority, Simmons argues that, "[w]ithout previous knowledge that anyone would be inside the residence, it is not reasonably foreseeable that the perpetrator would assault someone and/or inflict injuries upon her during the commission of the burglary." Simmons's argument mistakenly assumes the People had to prove he had actual knowledge Truong would be home. The People only had to prove a person in Simmons's position should have foreseen the possibility that, after 9:00 p.m., Truong would be home and that the gang's penchant for violence might lead to conduct amounting to torture. (See *People v. Nguyen*, *supra*, 21 Cal.App.4th at p. 530 ["For a criminal act to be 'reasonably foreseeable' or a 'natural and probable' consequence of another criminal design it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act."].) The Six Deuce Brims' plan and method of burglary—nighttime entry, use of a crowbar, and taking as much cash and jewelry in a short span of time in the presence of the homeowner—indicated the very real possibility of additional crimes of violence.

20

C.     *Substantial Evidence Supported Simmons's Conviction for Mayhem*

Section 203 provides:  "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."  (See *People v. Abelino*, *supra*, 62 Cal.App.5th at p. 581.)

Simmons does not challenge the jury's finding that one of the gang members who attacked Truong committed mayhem by, among other things, breaking her ribs, knocking out her teeth, and damaging her vision.  He argues only the "evidence presented at trial was not sufficient to show the mayhem was a natural and probable consequence of the residential robbery and burglary that occurred in the [Truong] residence."

Mayhem, however, was a natural and probable consequence of the burglary and attempted robbery of Truong for the same reason torture was.  Simmons and his colleagues chose a time when they would likely encounter Truong in her home and woke her up in bed to attack her and try to beat out of her where she kept cash at home.  The gang members brought with them a yellow crowbar, which was available not only to break into the home and break things in the house, but to inflict disabling, disfiguring, and crippling injuries on any uncooperative occupants (or even cooperative ones).  And the Six Deuce Brims' culture of violence, as well as the myriad of ways violence benefitted the gang, leaves little doubt a person in Simmons's position should have anticipated the gang members who broke into the residence to steal things would also commit other crimes, including mayhem.  (Cf. *People v. Manibusan* (2013) 58 Cal.4th

21

40, 91 ["a juror reasonably could have found that aggravated mayhem was a natural and probable consequence of either the robbery [the defendants] attempted to perpetrate . . . or their purpose to shoot someone for sadistic pleasure"]; *People v. Fagalilo* (1981) 123 Cal.App.3d 524, 532 [jury reasonably could have inferred the natural and probable consequence of a robbery was assault by means of force likely to produce great bodily injury because the defendants would need to resist to avoid capture].)

      D.     *Substantial Evidence Supported the Jury's Finding Simmons Aided and Abetted the Residential Robberies and Burglaries*

Section 31 provides: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." (See *People v. Smith*, *supra*, 60 Cal.4th at p. 611.) "'[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense; (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime.'" (*People v. Johnson* (2016) 62 Cal.4th 600, 630; accord, *People v. Mullins* (2018) 19 Cal.App.5th 594, 606.) "'[A] person who aids and abets the commission of a crime is a "principal" in the crime,

and thus shares the guilt of the actual perpetrator.'" (*Smith*, at p. 611; accord, *People v. Koenig* (2020) 58 Cal.App.5th 771, 799.)

"'The "act" required for aiding and abetting liability need not be a substantial factor in the offense.'" (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216.) "'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1147-1148.) "'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense'" (*Nguyen*, at p. 1054; see *People v. Johnson* (2019) 32 Cal.App.5th 26, 60), including flight (*People v. Lara* (2017) 9 Cal.App.5th 296, 322). "'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'" (*Nguyen*, at p. 1055.)

Substantial evidence supported the jury's finding that, even if Simmons did not step inside any of the targeted residences, he knew of his fellow gang members' unlawful purpose, intended to assist them in their enterprise, and aided them in committing each burglary and robbery. Detective Yzabal's description of his investigation of the crime spree by Six Deuce Brims gang members from 2017 to 2018 provided substantial evidence from which the jury could reasonably infer Simmons's culpability. Records of two cell phones associated with Simmons showed that the user of the phones traveled with Six Deuce Brims gang members (or at least with people using their phones) from Johnson's apartment in Long Beach to the San Gabriel Valley, stayed in the vicinity of the residence burglarized (and at times

established an open line with the phone of another gang member during the commission of the burglary), then traveled back to south or south central Los Angeles right before the police or homeowner arrived on the scene. The jury easily and reasonably could have concluded Simmons was the person who used those cell phones and traveled along the routes at the times mapped by Detective Yzabal.[8] The jury also reasonably could have inferred that, at a minimum, Simmons accompanied the perpetrators on each of the trips to the targeted residences and participated in the crimes as a driver, lookout, or general assistant. (See *People v. Mullins*, *supra*, 19 Cal.App.5th at p. 606 [even though the defendant "was not the person who provided force" to accomplish the robbery, "he was there to intimidate the victims . . . and thereby deprive them of their property"]; *People v. Lara*, *supra*, 9 Cal.App.5th at p. 322 [presence at the scene, companionship, and flight can support a finding the defendant aided and abetted a crime]; *People v. Franzen*, *supra*, 210 Cal.App.4th at p. 1216 ["""[l]iability attaches to anyone "concerned," however slight such concern may be, for the law establishes no degree of concern required to fix liability as a principal"""]; *People v. Swanson-Birabent* (2003) 114 Cal.App.4th

---

[8] The People provided extensive evidence the phones belonged to Simmons and his fellow gang members. In his social media postings, which included photographs of Simmons and identification of his gang moniker, Simmons gave the numbers associated with the cell phones to individuals who asked for his phone number. Surveillance video of Johnson's apartment showed Simmons making a call on a cell phone, and the cell phone registered activity at the exact time and location where Simmons made the call.

733, 743-744 [lookouts, getaway drivers, and persons present to divert suspicion are principals].)

Still images from surveillance videos of some of the targeted residences provided further incriminating evidence. Images from two different burglaries depicted a man who had facial features resembling Simmons's and who wore shoes similar to shoes Simmons had worn in the past. An image from surveillance video of Johnson's apartment depicted Simmons carrying a box filled with assorted items walking toward the apartment shortly after one of the burglaries. Simmons's suggestion, that perhaps he was along for the ride of the gang's crime spree as an innocent bystander, is highly implausible. As Officer Navarro testified, gang members like to commit crimes with other gang members because they know they will not snitch on each other.

Finally, police arrested Simmons shortly after the burglary of Ning's residence and found him near Ning's safe and in possession of an unusual amount of cash and jewelry. Those facts, along with the cell phone records placing him in the vicinity of Ning's home at the time of the burglary, proved his participation in that uncharged crime. (See *People v. Grimes* (2016) 1 Cal.5th 698, 731 ["We have recognized that '[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt.'"].) The jury reasonably found Simmons aided and abetted the burglaries and robberies of the other victims in this case. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 27 ["""We have long recognized "that if a person acts similarly in similar situations, he probably harbors the same

25

intent in each instance" . . . . [T]he inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution."'"']; *People v. Johnson* (2013) 221 Cal.App.4th 623, 635-636 [evidence of prior home invasion robbery involving the same modus operandi as the charged crime "was highly probative evidence"].)

Simmons argues that there was "no evidence presented that [he] was inside any of the residences, stole any jewelry or money inside the residences, or was the driver of any of the vehicles used to commit these crimes" and that, "[a]t most, the evidence showed [he] was merely present near the residences which were burglarized." Physical presence at the precise scene of the crime, however, is not required for aiding and abetting liability. (See *People v. Beeman* (1984) 35 Cal.3d 547, 554-555 ["The term 'aider and abettor' is now often used to refer to principals other than the perpetrator, whether or not they are present at the commission of the offense."]; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 121 ["A person can be convicted of an offense even if he is not in the room when the crime occurs."].) In addition, the evidence showed Simmons's presence near each crime scene was more than a coincidence. The burglars, wearing all black and armed with a crowbar, followed essentially the same plan every time. The jury reasonably could have inferred that Simmons knew the purpose and goal of the plan and that, based on his social media posts, he planned and carried out the "work" of aiding and abetting the burglaries and robberies in this case. (See *People v. Johnson*, *supra*, 32 Cal.App.5th at p. 57 ["'The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on "'isolated

26

bits of evidence.”"'”]; *People v. Weddington, supra,*
246 Cal.App.4th at p. 481 [same].)

E. *Substantial Evidence Supported the Jury's True Finding on the Gang Allegation on the Torture and Mayhem Convictions*

Simmons asserts substantial evidence did not support the jury's finding he intended to assist, further, or promote criminal conduct by gang members because the "evidence presented at trial showed the crimes of mayhem and torture were not committed to assist, further or promote the Six Deuce Brim gang." The record refutes this assertion.

Section 186.22, subdivision (b)(1), provides for additional or alternate punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."[9] (See *People v. Vargas* (2020) 9 Cal.5th 793, 821; *People v. Albillar* (2010) 51 Cal.4th 47, 54.) "There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1), both of which must be established by the evidence. [Citation.] The first prong requires proof that the underlying felony was 'gang

_____

[9] Effective January 1, 2022 the Legislature amended section 186.22 "to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343; see Stats. 2021, ch. 699, § 3 (Assem. Bill No. 333).) We quote the version of section 186.22, subdivision (b)(1), in effect at the time of Simmons's trial and sentencing for purposes of addressing Simmons's argument substantial evidence did not support the jury's finding under this version of the statute.

related,' that is, the defendant committed the charged offense 'for the benefit of, at the direction of, or in association with any criminal street gang.' [Citations.] The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members."'" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 948; see *Vargas*, at p. 821; *People v. Rivera* (2019) 7 Cal.5th 306, 331; *People v. Gonzalez* (2021) 59 Cal.App.5th 643, 648.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar*, *supra*, 51 Cal.4th at pp. 59-60; see *People v. Rivera*, *supra*, 7 Cal.5th at p. 331; *People v. Franklin*, *supra*, 248 Cal.App.4th at p. 947.) "As with all sufficiency claims, '"[w]e presume every fact in support of the judgment"' that can be '"reasonably deduced from the evidence."'" (*People v. Vargas*, *supra*, 9 Cal.5th at p. 822; see *Rivera*, at p. 331.)

Substantial evidence supported the jury's finding on the first prong of the gang enhancement statute, that Simmons aided and abetted torture and mayhem for the benefit of the gang. As discussed, torture involves cruel or extreme pain and suffering (see § 206), and mayhem involves disfiguring or disabling injuries (see § 203). Both are crimes of violence. (See *People v. Chatman* (2006) 38 Cal.4th 344, 393 ["'it is the continuum of sadistic violence that constitutes the torture'"]; *People v. Reed* (1984) 157 Cal.App.3d 489, 492 [mayhem is "a crime involving

28

destructive violence toward another"].)  Detective Hsiao testified the Six Deuce Brims gang created an atmosphere of fear and intimidation to discourage potential victims and witnesses from reporting crimes committed by the gang.  Officer Navarro described the importance to the gang of committing violent crimes.  The jury reasonably could have inferred that committing torture and mayhem contributed to the fear and intimidation the gang sought to create, which in turn enabled the members to commit further crimes with impunity.  (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 51 [gang expert's testimony that, "when the gang commits an act of violence, the enhanced reputation for violence 'speaks loudly' to members of the community," supported the finding of benefit to the gang]; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [violent crimes "elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward,'" and this "intimidation, obviously, makes it easier for the gang to continue committing the crimes for which it is known"].)

Substantial evidence also supported a finding Simmons committed torture and mayhem in association with his fellow gang members.  Simmons does not dispute he and his confederates were members of the Six Deuce Brims criminal street gang.  As discussed, the call detail records of Simmons's phone placed the user of the phone at times and locations consistent with him traveling to, remaining at, and leaving the Truong burglary site with the other members of the gang.  (See *People v. Weddington*, *supra*, 246 Cal.App.4th at p. 484 [the first prong "may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were 'on a frolic and detour unrelated

29

to the gang'"]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

Substantial evidence also supported the jury's finding on the second prong of section 186.22, subdivision (b)(1). Contrary to Simmons's assertion the prosecutor had to prove Simmons intended to assist, further, or promote the "primary activities" of the Six Deuce Brims, "'specific intent to *benefit* the gang is not required.'" (*People v. Leon* (2008) 161 Cal.App.4th 149, 162; see *People v. Thompkins* (2020) 50 Cal.App.5th 365, 403.) What is required is that the prosecutor proved the defendant "specifically intended to '"promote, further or assist in any criminal conduct by gang members."'" (*Thompkins,* at p. 403; see *Leon*, at p. 162.) The evidence here was that the perpetrator tortured Truong and inflicted disfiguring and disabling injuries in part to force her to say where she hid her money, which furthered the "criminal conduct" of the burglary and robbery. A reasonable jury could have inferred that, in aiding and abetting the burglary and robbery, Simmons specifically intended his fellow gang members to take any action necessary, including committing further crimes of violence, to accomplish their criminal objectives. (See *Thompkins*, at p. 403 ["[s]pecific intent "'is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense"'"]; *People v. Miranda* (2011) 192 Cal.App.4th 398, 411 ["'we routinely draw inferences about intent from the predictable results of action'"].) In addition, as discussed, because substantial evidence supported the jury's finding Simmons aided and abetted the commission of torture and mayhem by other members of the Six Deuce Brims

gang, "the jury may fairly infer that [he] had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar, supra*, 51 Cal.4th at p. 68; see *People v. Weddington, supra*, 246 Cal.App.4th at p. 485.)

F. *The Trial Court Erred in Failing To Stay Execution of the Sentence on Simmons's Conviction for Actively Participating in a Criminal Street Gang Conspiracy*

Simmons contends that, because the charge of actively participating in a criminal street gang conspiracy (count 1) "has the same objectives as the underlying crimes charged," the trial court should have stayed his sentence on count 1 under section 654. Simmons is correct.

Section 182.5 provides that "any person who actively participates in any criminal street gang, . . . with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, . . . and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (See *People v. Johnson* (2013) 57 Cal.4th 250, 261; *People v. Abbate* (2020) 58 Cal.App.5th 100, 107-108.) The "intended effect of the measure" enacted by the voters in 2000 as part of Proposition 21, Gang Violence and Juvenile Prevention Act of 1998 (*People v. Arroyo* (2016) 62 Cal.4th 589, 592), "was to *expand* the law [on conspiracy] to encompass gang-related activities more broadly." (*Johnson*, at p. 261; see *Abbate*, at p. 108.)

"'Because of the prohibition against multiple punishment in section 654, a defendant may not be sentenced "for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes. If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense." [Citations.] Thus, punishment for both conspiracy and the underlying substantive offense has been held impermissible when the conspiracy contemplated only the act performed in the substantive offense [citations], or when the substantive offenses are the means by which the conspiracy is carried out [citation].' [Citation.] On the other hand, '[p]unishment for both conspiracy and substantive offenses has been upheld when the conspiracy has broader or different objectives from the specific substantive offenses.'" (*People v. Beman* (2019) 32 Cal.App.5th 442, 446-447; see *People v. Vargas* (2001) 91 Cal.App.4th 506, 570-571.)

"'In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective.'" (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94.) "Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618; see *Raymundo M.*, at p. 94.)

The People presented evidence of 11 charged and one uncharged burglaries, two robberies, two attempted robberies, and one count each of elder abuse, torture, and mayhem.[10] As discussed, except for the elder abuse and one of the burglary counts, the jury found Simmons guilty on all counts, and the court imposed a sentence on each conviction. These crimes were the extent of the conspiracy under section 182.5.[11] Thus, substantial evidence did not support the trial court's implied finding to the contrary, and the court should have stayed execution of the sentence on count 1. (See *In re Cruz* (1966) 64 Cal.2d 178, 181 [trial court violated section 654 where "it [did] not appear that the conspiracy had any objective apart from the grand thefts for which petitioner was sentenced to prison"]; *People v. Briones* (2008) 167 Cal.App.4th 524, 529 [trial court should have stayed execution of the sentence on a conspiracy conviction because "[s]ection 654 prohibits multiple punishment for both the conspiracy and the substantive offenses that were its object"]; *People v. Ramirez* (1987) 189 Cal.App.3d 603, 617 [because "the evidence necessarily shows an agreement to commit sex offenses as well as murder, . . . punishment for both the sex offenses and the conspiracy violated the prohibition of section 654 just as would punishment for both conspiracy and attempted murder" (fn. omitted)].)

---

[10]     As we will discuss, the indictment did not allege the gang conspiracy included elder abuse, torture, or mayhem.

[11]     The jury could not use evidence of the Ning burglary to find the conspiracy had a broader objective than the substantive crimes the jury found Simmons committed because the jury instructions, in particular CALCRIM No. 375, limited the jury's

The People argue the gang conspiracy encompassed broader objectives than the substantive crimes the jury convicted Simmons of committing. For example, the People point out that, while the "gang conspiracy charged in count 1 of the indictment included 69 overt acts," Simmons "was not convicted of any crimes involving the break[-]in at the home of Robert Bigleman" and "was acquitted of the charges committed against Fuyang Gao." The People's argument proves the opposite. Although the indictment alleged 69 overt acts, the jury did not hear evidence of any acts other than those related to the burglary and robbery counts in this case. As for the Gao burglary, the jury's not guilty verdict on that count confirms the conspiracy did not extend beyond the crimes the jury found Simmons committed. (Compare *People v. Beman*, *supra*, 32 Cal.App.5th at pp. 445, 448 [section 654 did not bar punishment for both conspiracy to commit human trafficking and two counts of the substantive offenses of human trafficking where "the objectives of defendant's conspiracy with his codefendants to commit human trafficking went far beyond the specific conduct for which defendant was convicted in" those two counts]; *People v. Vargas*, *supra*, 91 Cal.App.4th at p. 571 ["there is strong evidence that the [gang], of which defendant was a member, conspired to kill not only [the victim], but other persons as well, in addition to the gang's overriding conspiracy"].)

---

consideration of that evidence to determine identity, intent, or common plan and precluded the jury from considering that evidence for any other purpose. (See *In re Romano* (1966) 64 Cal.2d 826, 828-829.)

G. *The Court Did Not Improperly Add 35 Years to Simmons's Sentence*

Simmons agues the trial court improperly added 35 "extra years" to his sentence by ordering the determinate sentences to run "consecutive to the sentence imposed in Count 20[,] thereby increasing the sentence that should have been imposed." But that's not what happened.

1. *Relevant Proceedings*

The trial court imposed the following sentences: on count 1 (actively participating in a criminal street gang conspiracy), a term of six years; on counts 3 and 4 (first degree robbery and burglary of Tracy Luong), a term of 16 years for the burglary and a (stayed) term of four years eight months for the robbery;[12] on count 5 (burglary of Therina Lin), a term of three years, stayed under section 654;[13] on count 6 (burglary of Yapei Xiong), a term of three years; on counts 8 and 9 (attempted residential robbery and burglary of Rhee), a term of four years eight months for the burglary and a (stayed) term of two years four months for the

---

[12] On count 3, the court initially sentenced Simmons to one year four months, plus three years four months for the gang enhancement. Nine days later, the court modified the sentence on that count. The court explained the sentence on count 3 should have been the full term and imposed the upper term of six years, plus 10 years under section 186.22, subdivision (b)(1)(C).

[13] The court should not have stayed execution of this term. It appears the court incorrectly believed counts 3, 4, and 5 all related to Tracy Luong, but in fact count 5 related to a different victim, Therina Lin.

attempted robbery; on count 11 (burglary of Jun Xuan, § 459), a term of three years; on counts 12, 13, and 14 (attempted residential robbery, burglary, and mayhem of Truong), terms of two years four months for attempted robbery, four years eight months for the burglary, and four years eight months for mayhem, all stayed; on count 15 (burglary of Brian Chen, § 459), a term of three years; on counts 16 and 17 (attempted residential robbery and burglary of Baoying Zhang), a term of four years eight months for burglary and a (stayed) term of four years eight months for the robbery; on count 18 (burglary of Iling Sun), a term of three years; on count 19 (burglary of Yuan Zhang, § 459), a term of three years; and on count 20 (torture of Truong, § 206), 15 years to life.

The court ordered that, "with the exception of the counts that were stayed pursuant to 654 on the determinate sentences," the determinate sentences "will be consecutive to each other," but "concurrent to count 20" (the indeterminate sentence). The clerk stated the aggregate determinate sentence was 46 years four months, and the court ordered Simmons to serve the determinate sentences first.

### 2. *The Trial Court Did Not Err*

"Section 669 requires that when a person has been convicted of two or more offenses (whether in the same or separate proceedings), the court must decide whether the terms are to run concurrently or consecutively." (*People v. Black* (2007) 41 Cal.4th 799, 820-821; see *People v. Clancey* (2013) 56 Cal.4th 562, 579 [trial court has "broad discretion" to decide whether to run the prison terms on multiple offenses concurrently or consecutively].) "When the defendant is sentenced to

36

determinate and indeterminate terms, the determinate term is served first." (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 211; see *People v. Garza* (2003) 107 Cal.App.4th 1081, 1094.) The court properly ordered Simmons to serve the determinate sentences first, and the clerk correctly computed the aggregate determinate term. Thus, the court ordered Simmons to serve the determinate term of 46 years four months first, with Simmons to serve the indeterminate life term after that (with the 15 years already served).

H. *Senate Bill No. 567 Applies to Simmons, and the Erroneous Denial of a Jury Trial Is Not Harmless*

While this appeal was pending, the Legislature made broad changes to the sentencing laws and the gang enhancement statute. Effective January 1, 2022, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170 to (among other things) limit the trial court's discretion to impose the upper term of imprisonment and to require the court in certain circumstances to impose the lower term. (Stats. 2021, ch. 731, § 1.3.) Assembly Bill No. 518 (2021-2022 Reg. Sess.) amended section 654 to no longer require the court to impose a sentence based on the longest possible term where an act or omission is punishable in different ways by different provisions of the law. (Stats. 2021, ch. 441, § 1.) And Assembly Bill No. 333 (2021-2022 Reg. Sess.) amended section 186.22 to alter the requirements for proving the gang enhancement under section 186.22, subdivision (b)(1), and the offense of actively participating in a

criminal street gang conspiracy under section 182.5. (Stats. 2021, ch. 699, § 3.)

We notified counsel for the parties of these new provisions and asked them to submit supplemental briefs on "the applicability, if any, of these recently enacted laws to this appeal." Simmons filed a letter brief asserting: "Appellant should receive the mid-term instead of the high term sentence for both counts one and eight per the newly enacted amendments to Penal Code § 1170, subdivision (b)(2)."[14] We agree with Simmons (and the People) that section 1170, subdivision (b)(2), applies retroactively to Simmons's sentences.

"'When the Legislature amends a statute so as to lessen the punishment[,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final.'"[15] (*People v. Esquivel* (2021)

---

[14]     As discussed, because the trial court renumbered for the jury the counts in the indictment, count 8 from the indictment was count 3 for purposes of the trial (the robbery of Tracy Luong, not the attempted robbery of Bong Rhee).

[15]     "'For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of

38

11 Cal.5th 671, 674; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307; *In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

Prior to January 1, 2022, section 1170, subdivision (b), provided in relevant part: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice." (See *People v. Sasser* (2015) 61 Cal.4th 1, 8; *People v. Estrada* (2020) 58 Cal.App.5th 839, 843.) Senate Bill No. 567 amended this provision so that it now provides: "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2). [¶] (2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."[16] (§ 1170, subd. (b), added by Stats. 2021, ch. 731, § 1.3; see *People v. Flores*, *supra*, 73 Cal.App.5th at p. 1038 & fn. 10.)

---

certiorari in the United States Supreme Court.'" (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

[16] Prior to the enactment of section 1170, subdivision (b)(2), the People only had to prove an aggravating fact by a preponderance of the evidence. (See *People v. Towne* (2008)

39

Because new section 1170, subdivision (b)(2), limits the trial court's discretion to impose the upper term of imprisonment, it is an "'ameliorative'" change in the law (*People v. Frahs* (2020) 9 Cal.5th 618, 628) that applies retroactively to nonfinal sentences like Simmons's.  (See *People v. Flores*, *supra*, 73 Cal.App.5th at p. 1039 ["the amended version of section 1170, subdivision (b) . . . applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal"]; see also *People v. Nasalga* (1996) 12 Cal.4th 784, 793 ["amendments . . . that mitigate punishment by increasing the dollar amount for certain crimes or enhancements should be applied retroactively, in the absence of a saving clause or other indicia of a contrary legislative intent"].)

Simmons argues that he "did not admit or stipulate to any circumstances in aggravation, and the jury did not make any findings beyond a reasonable doubt regarding circumstances in aggravation as to these counts."  The People argue Simmons "effectively stipulated to all the facts underlying the aggravating circumstances.  Because amended section 1170, subdivision (b)(1), does not require a jury trial when the defendant stipulates to the facts, [Simmons] is not entitled to relief."

"Effectively" stipulating was not, in these circumstances, stipulating.  It is true the People argued in a sentencing memorandum that six aggravating circumstances justified imposing the upper term of imprisonment, including that the crimes involved "great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty,

44 Cal.4th 63, 86; *People v. Hicks* (2017) 17 Cal.App.5th 496, 512; *People v. Weber* (2013) 217 Cal.App.4th 1041, 1065.)

40

viciousness, or callousness"; that "[m]any of the victims were elderly and particularly vulnerable"; and that the "crime involved an attempted or actual taking or damage of great monetary value." (See Cal. Rules of Court, rule 4.421.) And counsel for Simmons did take the position in a sentencing memorandum that, for purposes of sentencing under the law at the time, it "would be disingenuous for counsel to argue that those circumstances [in aggravation] do not exist. They clearly do and unfortunately for the defendant none of the factors in mitigation set forth in Rule 4.423 appear to apply." And at the sentencing hearing, when the trial court stated, "As I recall, you conceded that the People were correct on their enumeration of the aggravating factors," counsel for Simmons stated, "That is correct, Your Honor."

But counsel's concession was not a stipulation to the facts underlying the circumstances in aggravation that justify imposition of the upper term, within the meaning of section 1170, subdivision (b)(2). (See *People v. Mendias* (1993) 17 Cal.App.4th 195, 206, fn. 8 [distinguishing between a concession and a stipulation].) At the time counsel for Simmons decided not to contest the statements in the People's sentencing memorandum, the new law had not become effective. It is hard to see how counsel for Simmons could have intended to stipulate to facts justifying the upper term under section 1170, subdivision (b)(2), before the Legislature added this provision to require proof of such facts beyond a reasonable doubt. (See *People v. Jackson* (2005) 129 Cal.App.4th 129, 161 ["Oral statements of counsel may be treated as judicial admissions if they were intended to be such or reasonably construed by the court or the other party as such. This rule, however, does not apply to 'admissions which are

41

improvidently or unguardedly made, or which are in any degree ambiguous.'"].)

Citing *People v. Sandoval* (2007) 41 Cal.4th 825, 839 (*Sandoval*) the People argue that, even if Simmons did not stipulate to the circumstances in aggravation, any error in imposing the upper term was harmless because a jury "'unquestionably'" would have found true an aggravating circumstance to support the upper term of imprisonment. The record does not support the People's argument.

In *Sandoval, supra*, 41 Cal.4th 825 the Supreme Court held: "The denial of the right to a jury trial on aggravating circumstances is reviewed under the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. . . ." (*Id.* at p. 838.) "[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (*Id.* at p. 839; see *People v. Boyce* (2014) 59 Cal.4th 672, 728-729; *People v. Flores* (Feb. 3, 2022, A164257) ___ Cal.App.5th ___, ___ [2022 WL 557517, p. 5]; see also Cal. Const., art. VI, § 13.) The Supreme Court, however, cautioned that "the reviewing court cannot necessarily assume that the record reflects all of the evidence that would have been presented had aggravating circumstances been submitted to the jury." The Court observed that the defendant's incentive and opportunity at the sentencing hearing to contest any aggravating circumstance "were not necessarily the same as they would have been had the aggravating circumstances been tried to a jury" and that, "to the extent a potential aggravating circumstance at issue in a

particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval*, at pp. 839-840; see *Boyce*, at pp. 728-729.) These concerns weigh against finding the error harmless here.

Although Simmons did not call any witnesses in his defense, his trial counsel may have cross-examined the prosecution's witnesses more extensively had the law at the time required the prosecution to prove the circumstances in aggravation to a jury beyond a reasonable doubt. For example, trial counsel for Simmons largely left unchallenged the amount of cash and jewelry the perpetrators took in each of the burglaries and robberies, and counsel did not question the victims about any matters that had little to do with the elements of the crimes, such as the victims' vulnerability. (See Cal. Rules of Court, rule 4.421(a)(3), (9); compare *People v. DeHoyos* (2013) 57 Cal.4th 79, 154 ["Because [the] circumstances [in aggravation] clearly were relevant to defendant's intent in committing the crimes against [the victim], defendant had both reason and opportunity to challenge them at trial."].)

In addition, the different standard of proof may have affected counsel for Simmons's incentives. For example, had the standard of proof been beyond a reasonable doubt under section 1170, subdivision (b)(2), rather than by a preponderance of the evidence, trial counsel for Simmons may have chosen to contest the facts relevant to the aggravating factors described in the prosecutor's sentencing memorandum. The evidence regarding whether the crimes involved "great violence" or "great

bodily harm" (Cal. Rules of Court, rule 4.421(a)(1)) was not as clear-cut as the People suggest in their harmless error argument. The People rely on evidence the perpetrators violently beat Rhee and Truong. But on count 1 (actively participating in a criminal street gang conspiracy), the indictment did not allege the crimes of physical violence against Rhee and Troung were overt acts of the conspiracy. On count 3 (the robbery of Luong), the People did not present evidence the crime involved great violence or great bodily harm, and Luong did not testify the perpetrators physically injured her. She did state the perpetrators threatened her, but counsel for Simmons did not cross-examine Luong on this point (and there was no reason to do so under former section 1170, subdivision (b)). We cannot conclude the jury unquestionably would have found beyond a reasonable doubt that count 1 or count 3 involved great violence or great bodily harm. (Cf. *People v. Myles* (2012) 53 Cal.4th 1181, 1222 ["Given the undisputed evidence regarding defendant's gun use, counsel's concessions, and that the jury convicted defendant of first degree murder rather than a lesser offense, we conclude beyond a reasonable doubt that, under the same standard, the jury also would have found the aggravating circumstances that defendant used two firearms, fired multiple shots, and had not been provoked."].)

Finally, the other aggravating circumstances listed in the People's sentencing memorandum rest on the kind of vague or subjective standards the Supreme Court in *Sandoval, supra,* 41 Cal.4th at page 840 pointed out make it difficult for a reviewing court to determine how a jury would have assessed the evidence. As the Supreme Court explained, "Many of the aggravating circumstances described in the rules," such as

44

whether the victim "'was *particularly* vulnerable'" or whether the crime involved a "'taking or damage of *great* monetary value,'" "require an imprecise quantitative or comparative evaluation of the facts." (*Ibid*.; accord, *People v. Boyce*, *supra*, 59 Cal.4th at pp. 728-729 [same]; see *People v. Lincoln* (2007) 157 Cal.App.4th 196, 204 ["making assessments of what a jury would have decided with respect to 'somewhat vague or subjective standard[s]' is a thorny task"].)  We cannot conclude beyond a reasonable doubt the jury unquestionably would have found true any of the aggravating circumstances here.

Because the trial court's error in imposing the upper term on counts 1 and 3 was not harmless, we vacate the sentences on these counts and remand for the court to resentence Simmons in accordance with section 1170, subdivision (b)(2).  On remand, the court shall conduct a "'full resentencing'" (*People v. Buycks* (2018) 5 Cal.5th 857, 893), including applying the terms of any other ameliorative legislation that became effective January 1, 2022.

## DISPOSITION

The convictions are affirmed.  The trial court is directed to stay the execution of the sentence on count 1 under section 654 and to impose a sentence on count 5 of three years (which consists of one-third of the middle term of four years, plus one-third of the five-year term for the gang enhancement) that is consecutive to the other determinate sentences.  The trial court is

also directed to resentence Simmons under section 1170, subdivision (b)(2), and the terms of all applicable, newly enacted ameliorative legislation.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.